# United States Court of Appeals
## For the First Circuit

No. 04-2494

MARÍA YOLANDA MARCANO RIVERA; JORGE RODRÍGUEZ MATOS;
FABIOLA RODRÍGUEZ MARCANO,

Plaintiffs, Appellees,

v.

TURABO MEDICAL CENTER PARTNERSHIP d/b/a
HOSPITAL INTERAMERICANO DE MEDECINA AVANZADA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Héctor M. Laffitte, U.S. District Judge]

Before

Lynch, Lipez, and Howard, Circuit Judges.

Orlando H. Martínez-Echeverría, with whom Fernando E. Agrait
was on brief, for appellant.
Jorge M. Suro Ballester, with whom Carlos A. Ruiz was on
brief, for appellees.

July 15, 2005

**LIPEZ, Circuit Judge**. Defendant Hospital Interamericano de Medicina Avanzada ("HIMA") appeals from a jury verdict finding that it was negligent in monitoring the birth of Fabiola Rodríguez Marcano and that its negligence caused Fabiola severe and permanent neurological damage. HIMA argues that there was insufficient evidence to establish its liability and that the evidence showed instead that Dr. Pedro Roldán Millan ("Dr. Roldán"), the non-employee obstetrician who delivered Fabiola, was solely responsible for Fabiola's injuries. HIMA further claims that the district court erred in allowing testimony by one of the plaintiffs' experts and in not remitting the damages award or awarding a new trial on apportionment of liability. We affirm.

**I.**

**A.        Factual background**

We take the facts from the trial record, reciting them in the light most favorable to the verdict. See Grajales-Romero v. Am. Airlines, 194 F.3d 288, 292 (1st Cir. 1999).

On the morning of September 14, 2000, plaintiff María Marcano Rivera ("Marcano") was admitted to HIMA, a hospital in Caguas, Puerto Rico, pursuant to her obstetrician's decision to induce labor. The obstetrician, Dr. Roldán, was not an employee of HIMA but had privileges there.

At 10 a.m., HIMA nurses attached Marcano to a fetal monitor, which monitors both the fetus's heart rate and the

-2-

mother's uterine contractions. A fetal monitor provides a digital display of the fetal heart rate and prints out a paper record, known as a tracing, of the heart rate and the contractions. HIMA protocol dictates that nurses check the fetal monitor and record the fetal heart rate every 15 minutes during high-risk deliveries, including induced labor. HIMA protocol also provides that the nurse monitoring the delivery is responsible for notifying the physician of any abnormal fetal heart rate or uterine contraction findings.

At 11:45 a.m., Dr. Roldán induced labor by simultaneously administering Oxytocin through an intravenous drip and inserting in Marcano's vagina a 100 mcg tablet of Cytotec from his personal supply. Dr. Roldán's simultaneous administration of the two drugs was contrary to HIMA protocol and medical standards established by the American College of Obstetricians and Gynecologists ("ACOG"). Both Oxytocin and Cytotec stimulate uterine contractions; together they have a multiplier effect and can produce contractions that are too intense or too close together, thereby decreasing the flow of oxygen to the fetus. ACOG thus recommends a four-hour waiting period between administering Oxytocin and Cytotec. Moreover, the recommended dose of Cytotec -- when taken alone -- is only 25 mcg. The higher 100 mcg dose administered by Dr. Roldán also risks producing contractions which are too intense or too close together.

Shortly after Dr. Roldán administered the drugs, he left Marcano's room. Marcano soon began to feel intense contractions. Although she rang the nurse call button repeatedly, the nurse monitoring the delivery, Brenda Marrero, did not respond.

When Marcano's husband, Jorge Rodríguez Matos ("Rodríguez"), joined her at approximately 2:30 p.m., he found her in a desperate state because of frequent contractions. She told him that the contractions were not like the ones she experienced with the delivery of her first child and that she could not stand the pain. Rodríguez went to the nurses' station and asked them to summon Dr. Roldán. At approximately 2:45, Dr. Roldán returned to Marcano's room and administered Demerol, a pain killer. He remained in the room throughout the rest of the delivery.

Oddly, the tracing from the fetal heart rate monitor is missing for the period between 10 a.m. and 3:27 p.m., meaning there is no way to evaluate the fetus's heart rate and oxygen supply while Marcano was alone in her hospital room.[1] The tracing between

_____

[1]The record does include a form that purports to be Nurse Marrero's recording of the fetal heart rate every 30 minutes based on the monitor's digital display. However, the plaintiffs' expert questioned the accuracy of the entries on the form, testifying at trial that

> the frequency of the registered fetal heart rates was inadequate because it was every 30 minutes [instead of every 15 minutes as dictated by HIMA protocol], but the fetal heart rates which are registered in this form . . . are totally out of context with regards not only to the part of the fetal heart rate tracing which we did get an opportunity to evaluate, but [also] of the catastrophic condition of the baby when she was born. This is like

-4-

3:27 p.m. and 3:45 p.m. appears normal, but that reading does not preclude the possibility that the fetus was deprived of oxygen during the period for which the tracing is missing. Between 3:45 p.m. and 5 p.m., the tracing reveals a continuing pattern of contractions that were too intense and too close together, accompanied by a low fetal heart rate. These factors suggest that the fetus was not receiving sufficient oxygen. The tracing ends at approximately 5 p.m., when Marcano was transferred to the delivery room and the monitor was disconnected.

Baby Fabiola was born at 6:19 p.m. She was taken immediately to the neonatal intensive care unit, where she was diagnosed with neonatal asphyxia and seizures secondary to neonatal asphyxia, and where she spent approximately two weeks before being discharged to her parents. Marcano and Rodríguez did not learn until four months later that Fabiola had permanent neurological damage as a result of neonatal asphyxia. Fabiola continues to suffer from daily seizures, and her prognosis is grim. Although she has an anticipated life span of 45 years, she will never see, walk, or communicate, and will require a caregiver for the rest of her life.

another patient, another labor and delivery. This registers perfectly normal fetal heart tones . . . [that] are totally out of context with the clinical picture.

**B.**        **Procedural history**

On January 16, 2002, the plaintiffs sued Dr. Roldán and HIMA[2] in federal district court for medical malpractice resulting in severe neurological damage to Fabiola. Early in the litigation, the plaintiffs reached a settlement with Dr. Roldán, who is no longer in practice. Their malpractice claims against HIMA proceeded to trial in October 2003, principally on the theory that HIMA employees failed to adequately monitor the labor and childbirth process and that HIMA's failure contributed to Fabiola's injuries.[3] Specifically, the plaintiffs suggested that the neurological damage occurred during the period for which the tracing is missing, and that regular monitoring would have alerted Dr. Roldán to Fabiola's distress in enough time to avert permanent damage.

Following a five-day trial, the jury returned a verdict in favor of the plaintiffs. The jury found that both HIMA and Dr. Roldán had been negligent and that their negligence was the proximate cause of the plaintiffs' damages. It awarded $5.5 million in damages, apportioning 47% of the liability to HIMA and 53% of the liability to Dr. Roldán. Accordingly, the court

_____

[2]HIMA is also known as Centro Médico del Turabo, Inc.

[3]Because Dr. Roldán was not an employee of HIMA, the hospital is not vicariously liable for his negligence during the delivery process. Its liability is limited to the acts and omissions of its own employees -- here, the nursing staff.

entered judgment against HIMA for $2.585 million (i.e., 47% of $5.5 million).  The court subsequently denied HIMA's post-verdict motion for judgment as a matter of law, a new trial on apportionment of liability, or remittitur.

**II.**

HIMA raises several arguments on appeal.  First, it asserts that the district court erred in denying its motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50.  Second, it assigns error to the district court's decision to admit testimony by one of the plaintiffs' expert witnesses.  Finally, HIMA contends that the district court abused its discretion in failing to grant its motion for a new trial or remittitur under Federal Rule of Civil Procedure 59.  We consider these claims in turn.

**A.        Motion for Judgment as a Matter of Law**

While conceding that Fabiola suffered permanent neurological damage during birth, HIMA argues that the evidence at trial was insufficient to allow a reasonable jury to conclude that the damage was causally linked to negligent monitoring.  The district court rejected this argument in denying a post-verdict motion for judgment as a matter of law, concluding that

> there was ample evidence presented to the jury, which if believed, could sustain a finding that HIMA was indeed negligent in monitoring plaintiff's labor and that said negligence proximately caused the alleged injuries. . . . [T]he jury heard evidence that the monitoring was done every thirty minutes as opposed to every 15 minutes, as

was standard in induced labors. Most importantly, the jury was allowed to make reasonable inferences from the fact that a significant portion of the tracing of the fetal heart rate and uterine contractions monitoring machine was missing, and HIMA was unable to give any explanation therefor.

A party seeking to overturn a jury verdict faces an uphill battle. "Courts may only grant a judgment contravening a jury's determination when the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party." Rivera Castillo v. AutoKirey, Inc., 379 F.3d 4, 9 (1st Cir. 2004) (internal quotation marks omitted). We review de novo the district court's denial of a motion for judgment as a matter of law, viewing the evidence in the light most favorable to the nonmoving party. Tapalian v. Tusino, 377 F.3d 1, 5 (1st Cir. 2004).

The substantive law of Puerto Rico governs this diversity suit. See Rojas-Ithier v. Sociedad Española de Auxilio Mutuo y Beneficiencia de P.R., 394 F.3d 40, 43 (1st Cir. 2005). To prevail on a medical malpractice claim under Puerto Rico law, "a party must establish (1) the duty owed; (2) an act or omission transgressing that duty; and (3) a sufficient causal nexus between the breach and the harm." Id. HIMA cites deficiencies in the plaintiffs' evidence as to both the first and third prongs of this test.

-8-

1. Duty

Puerto Rico courts have explained the standard of care owed to patients as "[t]hat [level of care] which, recognizing the modern means of communication and education, . . . meets the professional requirements generally acknowledged by the medical profession." Lama v. Borras, 16 F.3d 473, 478 (1st Cir. 1994) (quoting Oliveros v. Abreu, 101 P.R. Dec. 209, 226 (1973)). The standard is a national one, and ordinarily must be demonstrated through expert testimony. Id.

Here, the plaintiffs' expert, Dr. Jose Juan Gorrín Peralta ("Dr. Gorrín"), explained that the standard of care requires monitoring high-risk deliveries, including induced labor, every 15 minutes. Monitoring includes evaluating both the fetal heart rate and uterine contraction information provided by the fetal monitor's paper tracings and the fetal heart rate information provided by the fetal monitor's digital display. Monitoring is a shared responsibility of the doctor and the nurse; when the doctor is not present, the nurse is in charge of the monitoring. Dr. Gorrín's testimony on this point was corroborated by HIMA's expert, Dr. José Vargas Cordero, who testified that when the doctor is not present, the nurse is in charge of checking both the tracing and the digital monitor, and that if the nurse notices an abnormal reading, she must call the doctor.

There was sufficient evidence for the jury to find that HIMA failed to monitor Marcano's labor in accordance with the national standard of care. It is undisputed that Nurse Marrero checked the fetal monitor's digital heart rate display at most every 30 minutes, instead of every 15 minutes as Dr. Gorrín testified was standard. Indeed, the jury may have concluded that Nurse Marrero did not even check the fetal heart rate monitor every 30 minutes. Dr. Gorrín testified that the fetal heart rates recorded by Marrero "are totally out of context not only to the part of the fetal heart rate tracing which we did get an opportunity to evaluate, but of the catastrophic condition of the baby when she was born," implying that Marrero may have falsified the record. Moreover, Marcano testified that she was alone in the hospital room between 11:45 a.m. and 2:30 p.m. -- a period of nearly three hours -- and that nurses failed to respond when she repeatedly attempted to summon them during that time. Based on this testimony, the jury could reasonably have concluded that Marrero failed to adequately monitor the labor.

2. <u>Causation</u>

To establish causation under Puerto Rico law, "[a] plaintiff must prove, by a preponderance of the evidence, that the physician's negligent conduct was the factor that 'most probably' caused harm to the plaintiff." <u>Lama</u>, 16 F.3d at 478 (quoting <u>Sierra Perez</u> v. <u>United States</u>, 779 F. Supp. 637, 643 (D.P.R.

1991)). While this causation standard does not require all other causes of damage to be eliminated, "a jury normally cannot find causation based on mere speculation and conjecture; expert testimony is generally essential." Id.; see also Rojas-Ithier, 394 F.3d at 43 ("[A] factfinder normally cannot find causation without the assistance of expert testimony to clarify complex medical and scientific issues that are more prevalent in medical malpractice cases than in standard negligence cases.").

HIMA argues that there was insufficient evidence for a reasonable jury to find that its negligent monitoring was "most probably" the factor that caused Fabiola to be injured during her delivery. It contends that the evidence demonstrated instead that Fabiola's injuries were mostly likely the result of Dr. Roldán's negligence.

The issue of causation is complicated in this case by the disappearance of the fetal monitor tracing for the period between 10 a.m. and 3:27 p.m. Experts for both parties agree that Fabiola's heart rate was in the normal range for a short time after 3:27, when the tracing begins, and that it dropped perilously low at approximately 5 p.m., shortly before the tracing ends. The experts also agree that the low heart rate reading at 5 p.m. indicates that Fabiola was in distress and that Dr. Roldán, who was present at the time, should have taken steps immediately to ameliorate the situation. Such steps would have included turning

off the Oxytocin drip to reduce the strength and frequency of contractions, turning Marcano on her side to increase the flow of oxygen to the fetus, administering oxygen to Marcano, and, if those measures failed, performing a cesarean section. It is undisputed that Dr. Roldán took none of these steps; by the time Fabiola was born at 6:19 p.m., she was suffering from neonatal asphyxia.

HIMA's medical experts testified that because the fetal monitor indicated a normal heart rate at 3:27 p.m. and an ominously low heart rate at 5 p.m., Fabiola's injuries must have occurred sometime between 3:27 p.m. and 6:19 p.m. Emphasizing that Dr. Roldán was present throughout that period and failed to act, HIMA argues that Fabiola's injuries are directly attributable to the doctor's failure to intervene and that any failure of monitoring before 3:27 p.m. did not cause the asphyxia. HIMA further contends that without the tracing for the period before 3:27 p.m., any conclusion that the injury occurred during that period would be based on impermissible speculation.

HIMA is correct that, without the missing tracing, it is impossible to know with certainty whether the fetus was in distress before 3:27 p.m. -- or, more particularly, between 11:45 a.m., when Dr. Roldán induced the labor and left a nurse in charge of the monitoring, and 2:45 p.m., when Dr. Roldán returned to Marcano's bedside to supervise the delivery. It does not follow, however, that no reasonable jury could find that negligent monitoring during

that period most probably caused or contributed to Fabiola's injuries. Although HIMA's experts testified that the normal fetal heart rate at 3:27 p.m. indicated a smooth process up to that point, the plaintiffs' expert, Dr. Gorrín, took a different position. He testified that a normal fetal heart rate at 3:27 p.m. does not rule out the possibility that the fetus was in distress earlier:

> The baby could have had an hypoxic episode producing asphyxia, and mother nature will try to preserve life, and the baby's heart will not necessarily stay at [the below-normal rate of] 60 beats per minute or the baby might not even die if he was severely asphyxiated during a window of time when he or she was subjected not to one, but to two medications, one of which at a very excessive dose and another one at a dose we'll never know about, without monitoring. I cannot say just because there was an 18-minute window [between 3:27 p.m. and 3:45 p.m.] with an adequate baseline fetal heart rate that nothing else happened before [the beginning of the tracing at 3:27 p.m.].

Dr. Gorrín's testimony that the fetus may have been deprived of oxygen between 11:45 a.m. and 3:27 p.m. is consistent with the evidence presented about the effects of Oxytocin and Cytotec, the drugs Dr. Roldán used to induce labor. Experts for both parties testified that it is contraindicated to administer Oxytocin and Cytotec simultaneously because, in the words of Dr. Gorrín,

> the synergistic effect of one drug, which acts to produce uterine contractions on top of another, which also acts to produce uterine contractions, will cause something like adding two plus two and getting five instead of four. . . One thing works with the other, and the lump effect is a lot more than just the sum of each one.

-13-

The experts also testified that contractions that are too intense or too frequent can deprive the fetus of oxygen and lead to a depressed heart rate. Shockingly, Dr. Roldán administered both Oxytocin and Cytotec simultaneously, and he administered four times the appropriate dose of Cytotec.

According to Marcano's testimony, the intense contractions began almost immediately after Dr. Roldán administered the drugs at 11:45 a.m., and continued until at least 2:45 p.m., when her husband summoned Dr. Roldán to return to the room. That timing is consistent with Dr. Gorrín's testimony that Oxytocin would exert its effect within ten minutes of being administered and that Cytotec, if placed in the vagina as it was here, would also exert its effect in a short while. That timing is also consistent with ACOG's recommendation that doctors wait four hours between administering Oxytocin and Cytotec; the waiting period suggests that either drug exerts its strongest effects in the hours immediately after it is administered. A reasonable jury could therefore have concluded that Marcano suffered the most intense and frequent contractions beginning shortly after 11:45 a.m., that the missing tracing would reveal that Fabiola was deprived of oxygen during this period, and that negligent monitoring between 11:45 a.m. and Dr. Roldán's return at 2:45 p.m. caused or contributed to Fabiola's injuries. Although HIMA's experts testified that the damage occurred later, such contradictory expert testimony "does

nothing to vitiate the sufficiency of the plaintiff's proof." Muñiz v. Rovira, 373 F.3d 1, 5 (1st Cir. 2004).

The plaintiffs introduced sufficient evidence to support a finding that negligent monitoring on the part of HIMA caused Fabiola's injuries. The district court therefore did not err in denying HIMA's Rule 50 motion for judgment as a matter of law.

**B.        Admission of Expert Testimony**

The plaintiffs offered testimony at trial by life-care planner Frank Woodrich regarding the projected cost of Fabiola's future care. HIMA objected to Woodrich's testimony, both through a motion in limine and at trial, arguing that Woodrich's methodology, the foundation for his testimony, was not reliable. The court denied the motion in limine without explanation. In response to the renewed objection at the outset of Woodrich's testimony, the court allowed HIMA to conduct a brief voir dire of Woodrich. After a series of questions focusing on Woodrich's failure to have a physician review his projections regarding Fabiola's future medical needs, HIMA moved again to strike Woodrich as an expert. The district court overruled the motion, commenting that "what you're doing is going to the weight, not to the expertise." HIMA argues that the district court's ruling was erroneous.

The admission of expert testimony is governed by Federal Rule of Evidence 702, which requires that "(1) the testimony is

based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Rule 702 "imposes a gate-keeping function on the trial judge to ensure that an expert's testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" United States v. Mooney, 315 F.3d 54, 62 (1st Cir. 2002) (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993)). We review the district court's decision to admit expert testimony for abuse of discretion. Id.

The district court considered Woodrich's professional credentials and ascertained that he had been admitted as an expert on rehabilitation and life-care planning in numerous state and federal courts before accepting him as an expert in this case. Woodrich also testified that his proposed care plan for Fabiola was based on a review of records from the agency providing her with skilled nursing care, a letter from her physician, and an interview of Fabiola's family and caregiver. Although Woodrich's report might have benefitted from a physician's review of the projections regarding Fabiola's future needs, the court did not abuse its discretion in determining that Woodrich's methodology was sufficiently reliable for admissibility.

**C.      Motion for a New Trial or Remittitur**

Finally, HIMA claims that the district court erred in denying its motion for new trial or remittitur under Federal Rule of Civil Procedure 59. "A district court should only grant such motions if the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice." Johnson v. Spencer Press of Me., Inc., 364 F.3d 368, 375 (1st Cir. 2004) (internal quotation marks omitted). Our review is for an abuse of discretion. Id.

1. Apportionment of Liability

HIMA contends that even if its negligent monitoring played a role in Fabiola's injuries, its negligence was far outweighed by Dr. Roldán's negligence in inducing and handling the labor. As such, HIMA maintains, there was insufficient evidence to support a jury finding that it was liable for 47% of the damage and it is entitled to a new trial on apportionment of liability. The district court rejected this argument, ruling that "the plaintiff's expert witness and several documents admitted into evidence" supported a finding that HIMA's negligence caused 47% of the plaintiffs' damages. We agree.

In a repeat of their argument that there was insufficient evidence that the hospital caused or contributed to Fabiola's injuries, HIMA argues that without the missing tracing, any evidence that Fabiola was deprived of oxygen while the nurse was

-17-

responsible for monitoring in Dr. Roldán's absence (i.e., between 11:45 a.m. and 2:45 p.m.) is impermissible speculation. That reasoning would have the effect of punishing the plaintiffs for HIMA's failure to produce the tracing, and we reject it again. Although there is no way to know for certain what happened between 11:45 a.m. and 2:45 p.m. without the tracing, the circumstantial evidence, together with Dr. Gorrín's expert testimony, would allow a reasonable jury to find that Marcano's strong contractions between 11:45 a.m. and 2:45 p.m. deprived Fabiola of oxygen and that HIMA's negligent monitoring during that period deprived Dr. Roldán of an opportunity to intervene before Fabiola suffered permanent damage. While Dr. Roldán was unquestionably negligent as well, the 47-53 apportionment of liability was not contrary to the clear weight of the evidence.

2. Excessiveness

Under the Supreme Court's holding in Gasperini v. Center for Humanities, Inc., 518 U.S. 415 (1996), federal courts sitting in diversity must apply state substantive law standards in reviewing jury awards if the state law departs from the federal standards for judging excessiveness. See id. at 431 ("Erie [R.R. Co. v. Tompkins, 304 U.S. 64 (1938),] precludes a recovery in federal court significantly larger than the recovery that would have been tolerated in state court."). Emphasizing that the Puerto Rico Supreme Court has reduced damages awards to victims of medical

-18-

malpractice to conform to its own precedent, HIMA maintains that the district court was obligated under Gasperini to reduce the plaintiffs' award to conform with Puerto Rico precedent. The district court rejected this argument in a post-verdict ruling.

We have previously rejected the argument that Gasperini requires federal district courts to review damages awards for consistency with awards approved by the Supreme Court of Puerto Rico in similar cases. As we have explained, Gasperini would control if state law departed from the ordinary practice of reviewing awards under the federal standards for judging excessiveness, but Puerto Rico law "suggests no such departure." Grajales-Romero, 194 F.3d at 300 (internal quotation marks omitted); see also Mejias Quiros v. Maxxam Prop. Corp., 108 F.3d 425, 427 n.1 (1st Cir. 1997) (same); cf. Stewart v. Tupperware Corp., 356 F.3d 335, 339 (1st Cir. 2004) (applying Grajales-Romero to the amount-in-controversy determination for purposes of diversity jurisdiction).

Emphasizing that none of the cases in which we have rejected Gasperini arguments involved medical malpractice claims, HIMA asserts that Gasperini requires a remittitur of damages here despite our extant case law. HIMA's argument is based primarily on Nieves Cruz v. Universidad de Puerto Rico, 151 P.R. Dec. 150 (2000), a case in which the Puerto Rico Supreme Court remitted a $3.9 million award to a minor plaintiff who, like Fabiola, suffered

from severe hypoxia during childbirth.  In reducing the original judgment by approximately 50%, the Puerto Rico Supreme Court explained that it was "[f]ollowing the parameters of . . . precedent." Id. (certified translation).  The precedent on which the Nieves court relied was Riley v. Rodríguez de Pacheco, 119 P.R. Dec. 762 (1987), in which the court reduced a damages award in a medical malpractice case because "[w]ithout certain reasonable limits, the compensation would cease to have the characteristic of compensation [and would] become punitive" (quoted in Nieves, 151 P.R. Dec. 150 (certified translation)).  HIMA contends that Nieves reflects a Puerto Rico standard for reviewing damages awards in medical malpractice cases that differs from the federal standard of reviewing to determine whether an award is "grossly excessive," and that Gasperini requires us to adopt the Puerto Rico standard in this case.

We view this issue as a close one.  As HIMA emphasizes, the Puerto Rico Supreme Court has remitted a damages award in at least two medical malpractice cases to conform with the Riley precedent.  See Nieves, 151 P.R. Dec. 150; Blás Toledo v. Hospital Nuestra Señora de la Guadalupe, 146 P.R. Dec. 267 (1998).  On the other hand, the Supreme Court of Puerto Rico has indicated that it "will not intervene in the decision on the estimation of damages issued by the lower courts, unless the amounts granted are ridiculously low or exaggeratedly high." Nieves, 151 P.R. Dec. 150

-20-

(certified translation). Puerto Rico's "exaggeratedly high" standard echoes the federal "grossly excessive" standard. That consonance distinguishes this case from Gasperini, which involved a New York law that empowered state courts to reduce any damages award that "deviates materially from what would be reasonable compensation." 518 U.S. at 418. The Supreme Court emphasized that New York's "deviates materially" rule entailed "[m]ore rigorous comparative evaluations" than the federal standard and that it had a "manifestly substantive" objective. Id. at 429. Unlike New York's "deviates materially" standard, the Puerto Rico Supreme Court's standard has been expressed in terms similar to the federal standard.

In the end, therefore, we are unable to conclude that the remittiturs in Blás-Toledo and Nieves mean that the Puerto Rico Supreme Court has adopted a more rigorous standard of review for medical malpractice damages that is tantamount to a substantive rule of law that must be applied in diversity cases. That is, we cannot say, on the basis of the available precedents, that Puerto Rico case law suggests a "departure from [the] ordinary practice of reviewing awards under the federal standards for judging excessiveness." Grajales-Romero, 194 F.3d at 300 (internal quotation marks omitted) (alteration in original). In the absence of such a departure, Gasperini controls. See id.

Therefore, the district court did not abuse its discretion in rejecting HIMA's claim that the damages awarded to the plaintiffs were excessive. "[A] party seeking remittitur bears a heavy burden of showing that an award is grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." Currier v. United Techs. Corp., 393 F.3d 246, 256 (1st Cir. 2004) (internal quotation marks omitted). As the district court recognized, the plaintiffs presented ample evidence of the severe physical and emotional toll that Fabiola's permanent injuries have inflicted, and will continue to inflict, on both her and her family. Woodrich testified that Fabiola's life-care plan alone had a cost of approximately $1.9 million. The plaintiffs also presented evidence that Fabiola's loss of potential income was approximately $350,000, and that Fabiola and her parents suffered severe pain and anguish as a result of her injuries. In light of this evidence, the jury awarded $4 million to Fabiola, $1 million to her mother, and $500,000 to her father.[4] Moreover, HIMA

---

[4]In summarizing the evidence supporting the $5.5 million damages award, the court emphasized that

> [b]aby Fabiola, who was only three years old at the time of trial, has a long life expectancy. In fact, Dr. Woodrich, an expert in rehabilitation counseling and life care planning, prepared a life care plan for Fabiola which was submitted to the jury . . . . There was also testimony from Carlos Rodríguez, an economist, relative to Fabiola's loss of potential income. The jury also heard testimony regarding baby Fabiola's grim prognosis;

conceded at trial that it had "presented no evidence to offset Fabiola's and her family's damages. We agree that she has suffered serious damages, both the baby and the family. Our sole issues with the damages is not to negate [their] existence, but to make clear that it was Dr. Pedro Roldán, and not HIMA, [who was] the responsible party." In light of this concession, together with the evidence offered at trial, an award of $5.5 million (of which HIMA will pay $2.585 million) does not shock the conscience. See Muñiz, 373 F.3d at 6 (upholding a medical malpractice award of $2 million to a minor who suffered nerve damage to his arm and shoulder at birth).

**Affirmed.**

---

the fact that she has no chance for a normal development, the fact that she will require a care giver for the rest of her life; and the physical pain and anguish that she endures as a result of her daily physical therapy sessions. The jury also heard testimony of Haydée Costas, an expert in psychiatry, who diagnosed Maria Yolanda Marcano as suffering from a major depression. The record in this case is replete with evidence of the pain endured and yet to be endured by both Fabiola and her parents, as a result of the injuries that she sustained at childbirth.