**Dilma PAGES–RAMIREZ, et al., Plaintiffs**

v.

**HOSPITAL ESPAÑOL AUXILIO MUTUO DE PUERTO RICO, INC., et al., Defendants.**

**Civil No. 07–1407 (JP).**

United States District Court, D. Puerto Rico.

April 7, 2008.

David Efron, Esq., Alejandro J. Fernández–Muzaurieta, Esq., David Efron Law Offices, San Juan, PR, for Plaintiffs.

Juan Antonio Pedrero–Lozada, Esq., Arroyo, Monrouzean & Associates, Miguel G. Laffitte, Esq., Delgado & Fernández, María Z. Trigo–Ferraiuoli, Esq., Doris Quiñones–Tridas, Esq., Quiñones–Tridas Law Office, P.S.C., San Juan, PR, Eugene F. Hestres–Vélez, Esq., Eugene F. Hestres–Rodríguez, Esq., Bird, Bird & Hestres, Old San Juan, PR, for Defendants.

## OPINION AND ORDER

JAIME PIERAS, JR., Senior District Judge.

Before the Court is a motion for summary judgment (No. 52) filed by Defendant Hospital Español Auxilio Mutuo ("HEAM") and its insurer, Admiral Insurance Company ("Admiral"). Also before the Court is Plaintiffs' opposition thereto (No. 54). Plaintiffs Dilma Pagés–Ramírez ("Pagés"), Michael Pietri–Pozzi ("Pietri"), the conjugal partnership between them, and their child Giovanni Pietri–Pagés ("Giovanni") (collectively, "Plaintiffs"), brought the instant action alleging medical malpractice against Defendants HEAM, Admiral, Dr. Antonio Ramírez–Gonzalez ("Ramírez"), and Insurers Syndicate for the Joint Underwriting of Medical–Hospital Professional Liability Insurance ("SIMED"), pursuant to P.R. Laws Ann. tit. 31, Sections 5141–5142, and P.R. Laws. Ann. tit. 26, Section 2003, for the injuries sustained by Giovanni during his birth.

Defendants HEAM and Admiral move the Court for summary judgment on the grounds that a hospital cannot be held liable for the alleged malpractice of its nursing staff when the nurses are simply following the orders of a physician. Defendants also argue that a hospital cannot be held liable for the alleged malpractice of a private physician who merely has privileges at said hospital. For the reasons stated here, Defendants' motion (No. 52) is **DENIED.**[1]

## I. FACTUAL ALLEGATIONS

On May 19, 2005, Plaintiff Pagés, age thirty-three, arrived at Defendant HEAM at her thirty-sixth week of pregnancy to deliver her baby, Plaintiff Giovanni. Defendant Ramírez was the physician in charge of Plaintiff Pagés' care during pregnancy, and he was the attending physician at the birth. During the delivery, Plaintiffs allege that Giovanni suffered or acquired profound multi-organ damage, respiratory failure, sepsis, asphyxia, and seizures. Due to the alleged negligence of Defendants during Plaintiff Pagés' pre-natal care and delivery, Plaintiff Giovanni was born with severe birth defects including cerebral palsy. Plaintiff Giovanni remained hospitalized at HEAM until August 5, 2005, when he was transferred to San Jorge Children's Hospital to continue treatment.

Plaintiffs make numerous claims that Defendants departed from medical standards, including 1) failing to record measurements of the uterine fundus throughout the birth, 2) failing to elicit a comprehensive obstetrical history from a high risk patient, 3) failing to estimate the fetal weight and to enter same in the delivery record, 4) proceeding with labor and delivery with incomplete prenatal record, 5) attempting a mid-pelvic delivery by vacuum extraction, especially where the heart monitor showed a problematic pattern, 6) failing to place an internal fetal heart monitor, 7) failing to monitor the baby's heart rate, 8) failing to timely call for a Cesarean-section delivery, 9) failing to timely per-

---

**1.** The other Defendants in the case, Ramírez and his insurer, SIMED, did not move for summary judgment.

form a Cesarean-section delivery, and 10) failing to timely diagnose and treat the baby's fetal distress.

Plaintiffs allege that, as a result of Defendants' departures from medical standards, Plaintiff Giovanni is catastrophically injured, with severe brain damage and physical abnormalities that are permanent and incapacitating. This has caused Plaintiffs Pagés and Pietri to suffer emotional anguish. Due to Plaintiffs' limited economic resources, Plaintiff Giovanni allegedly has not been able to receive sufficient quality medical care or therapy.

Defendant HEAM claims that it complied with the generally accepted standards for hospital care and that Plaintiffs received the degree of care that a reasonable and prudent person should provide. HEAM alleges that its personnel did not breach their duty or engage in any omission that could be considered as the cause of damages allegedly suffered by Plaintiffs. Defendants further claim that Plaintiffs have not provided enough evidence to overcome the heavy burden of the presumption of appropriate medical attention.

## II. *MATERIAL FACTS NOT IN GENUINE ISSUE OR DISPUTE:*

The following facts were agreed upon by the parties at the Initial Scheduling Conference held before the Court on September 14, 2007:

1. Plaintiffs Pagés and Pietri are the parents of Plaintiff Giovanni.

2. Defendant HEAM is a Puerto Rico corporation, with its principal place of business in Puerto Rico. It owns and operates a hospital of the same name located in San Juan.

3. Defendant Ramírez is a medical doctor, married to co-defendant Jane Doe. Ramírez intervened in the prenatal care and labor and delivery of Plaintiff Pagés and her son Giovanni. Ramírez and his wife are residents of Puerto Rico.

4. Defendant Ramírez was Plaintiff Pagés' obstetrician for her pregnancy with Giovanni.

5. Plaintiff Pagés received pre-natal care through her private physician, Defendant Ramírez.

6. At all times relevant to this case, Defendant Ramírez was a duly licensed physician with a specialty in obstetrics and gynecology, authorized to practice medicine in Puerto Rico, who had privileges to practice obstetrics and gynecology at HEAM.

7. At all times relevant to this case, Defendant Ramírez had a medical malpractice policy number PRM–10714 (March 2, 2007 to March 2, 2008, retroactive March 2, 2001), issued by SIMED, with limits of $100,000.00. Said policy is subject to its own terms, limits, conditions and restrictions.

8. By October 22, 2004, Plaintiff Pagés, then thirty-three years old, visited Defendant Ramírez's office for a prenatal evaluation. She was six weeks pregnant at the time.

9. Plaintiff Pagés referred a history of four pregnancies and one previous abortion to Ramírez.

10. Plaintiff Pagés was instructed to return for follow-up in three weeks.

11. Her estimated due date was set for June 13, 2005.

12. Plaintiff Pagés visited Defendant Ramírez to receive a pre-natal check-up on December 17, 2004.

13. Plaintiff Pagés made subsequent visits to Defendant Ramírez on February 9, March 14, March 18, April 22 and May 12, 2005. On her

May 12, 2005 visit, Plaintiff Pagés was said to be thirty-five weeks pregnant. Her expected due date was changed to June 1, 2005.

14. Plaintiff Pagés arrived at HEAM on May 19, 2005, at 2:09 p.m., in active labor, with a diagnosis of intrauterine pregnancy at thirty-six weeks of gestation.

15. Laboratory work was performed upon Plaintiff Pagés' admission to HEAM.

16. Also on May 19, 2005, at 3:00 p.m., Plaintiff Pagés was admitted to the labor room. On vaginal examination, the cervix was ninety percent effaced and six centimeters dilated with the vertex at the negative two station. Plaintiff Pagés' blood pressure was 110/70 and her contractions were every six minutes.

17. Also on May 19, 2005, by 4:30 p.m., there had been no change in the findings on vaginal examination. Intravenous pitocin was running at a rate of one milli unit/minute and her contractions were every five minutes. The membranes were artificially ruptured at 4:45 p.m., discharging clear fluid, and epidural anesthesia was begun.

18. Also on May 19, 2005, at about 5:37 p.m., the baby's fetal heart rate went down. Plaintiff Pagés was placed on her right side and the baby's heart rate went up to 120 beats per minute.

19. Also on May 19, 2005, at 6:00 p.m., the vaginal examination revealed the cervix to be 8 centimeters dilated with the vertex at the negative one station. The pitocin was running at a rate of two milli units/minute and the contractions were every three minutes.

20. Also on May 19, 2005, by 6:45 p.m., the cervix was said to be fully dilated and the vertex at the positive two station. Plaintiff Pagés was placed in the lithotomy position and the peritoneal lavage was affected. An attempt at vacuum extraction was carried out without success.

21. A spinal anesthesia was attempted but changed to general anesthesia due to unavailability to perform spinal.

22. Also on May 19, 2005, Plaintiff Giovanni was delivered at 7:55 p.m. by Defendant Ramírez via low transverse Cesarean section. Giovanni weighed nine pounds and four ounces, and had an Apgar score of 2/7. Giovanni did not cry, did not have good muscular tone, was cyanotic, and his heart rate was 120 beats/minute. He was described as macrosomic.

23. Giovanni was assisted by a neonatologist who proceeded to intubate him and to transfer him to the Hospital's neonatal intensive care unit.

24. When Plaintiff Giovanni was transferred to the Neonatal Intensive Care Unit, he was placed on a ventilator.

25. Plaintiff Giovanni's umbilical cord was sent to the laboratory for cord gases and the pH was 6.92, the bicarbonate was 20.2, the $pCO_2$ was ninety-seven and the base excess was –12.6.

26. After delivery, Plaintiff Pagés developed uterine atony, requiring the transfusion of 4 units of blood. She remained hospitalized until May 24, 2005.

27. Plaintiff Giovanni remained at the Hospital until August 5, 2005, when he was transferred to San Jorge

Children's Hospital to continue treatment.

28. The discharge summary at the Hospital indicates the following diagnoses for Plaintiff Giovanni:

R/O Aspiration—Gastric Content

Atelectasis

Birth Asphyxia

Gastroesophogeal reflux Hypertonia

Hypertonia

Hypocalcemia—neonatal

Hypokalemia

Hyponatremia

R/O Inborn Error of Metabolism

Jitteriness

Nutritional Support

Perinatal Depression

Poor Feeder

Psychosocial Intervention

Renal Dysfunction

Respiratory Failure

Respiratory Insufficiency

Seizures

Sepsis-newborn

Term Infant

Urinary Tract Infection-newborn

29. Defendant HEAM has a professional liability policy with Admiral Insurance Company, No. 000003905. Said policy has a self-insured retention of $500,000.00 per claim on a $1,000,000.00 policy limit, per claim, and $3,000,000.00 aggregate.

The following facts are deemed uncontested by the Court because they were included in the motion for summary judgment and opposition and were agreed upon, or they were properly supported by evidence and not genuinely opposed:

1. Defendant Ramírez was Plaintiff Pagés' physician for all five of her pregnancies, including that with Giovanni, and therefore Plaintiff Pagés had established a close relationship with Defendant Ramírez.

2. On the day of Plaintiff Giovanni's birth, Plaintiff Pagés had previously visited Defendant Ramírez's office prior to the birth. After examining her, Defendant Ramírez told Plaintiff Pagés that she could not go back to her home and that she should go to the hospital for admission thereto.

3. Defendant Ramírez was present in the labor room throughout the afternoon.

4. Dr. Carolyn Crawford ("Dr.Crawford") has been retained as one of Plaintiffs' expert witnesses.

5. According to Dr. Crawford, an obstetrician has to make the ultimate decision whether to put an internal fetal monitor instead of an external fetal monitor.

6. According to Dr. Crawford, in the absence of a hospital protocol stating otherwise, it is the physician (as opposed to a nurse) who orders the administration of pitocin and whether it should be increased.

7. At 4:30 p.m. on May 19, 2005, Defendant Ramírez ordered the administration of pitocin to Plaintiff Pagés.

8. At about 4:45 p.m. on May 19, 2005, the order given by Defendant Ramírez to administer pitocin was carried out by Defendant HEAM's nurse.

III. **LEGAL STANDARD FOR A MOTION FOR SUMMARY JUDGMENT**

Summary judgment serves to assess the proof to determine if there is a genuine need for trial. *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990).

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the record, including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, viewed in the light most favorable to the nonmoving party, reveals no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Zambrana–Marrero v. Suárez–Cruz,* 172 F.3d 122, 125 (1st Cir.1999) (stating that summary judgment is appropriate when, after evaluating the record in the light most favorable to the non-moving party, the evidence "fails to yield a trial worthy issue as to some material fact"); *Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993); *Canal Ins. Co. v. Benner,* 980 F.2d 23, 25 (1st Cir.1992). The Supreme Court has stated that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In this way, a fact is material if, based on the substantive law at issue, it might affect the outcome of the case. *See Mack v. Great Atl. and Pac. Tea Co., Inc.,* 871 F.2d 179, 181 (1st Cir.1989).

■ On a summary judgment motion, the movant bears the burden of "informing the district court of the basis for its motion and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the movant meets this burden, the burden shifts to the opposing party who may not rest upon mere allegations or denials of the pleadings, but must affirmatively show, through the filing of supporting affidavits or otherwise, that there is a genuine issue of material fact for trial. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Goldman,* 985 F.2d at 1116.

## IV. *ANALYSIS*

Plaintiffs brought this tort action for medical malpractice pursuant to P.R. Laws Ann. tit. 31, Sections 5141–5142, claiming that Defendants deviated from the standard of care required of medical professionals, thereby causing Plaintiff Giovanni to be born with severe birth defects. ·

■■ Because this action's jurisdictional basis in federal court is diversity of citizenship of the parties, Puerto Rico substantive law applies. *Hanna v. Plumer,* 380 U.S. 460, 467, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965); *see also Lama v. Borrás,* 16 F.3d 473, 477–78 (1st Cir.1994). In this jurisdiction, tort liability for medical malpractice arises under Article 1802 of the Civil Code of Puerto Rico, P.R. Laws Ann. tit. 31, Section 5141. Under Puerto Rico law, three elements comprise a *prima facie* case of medical malpractice: a party must establish (1) the duty owed; (2) an act or omission transgressing that duty; and (3) a sufficient causal nexus between the breach and the harm. *Otero v. United States,* 428 F.Supp.2d 34, 45–46 (D.P.R. 2006) (citing *Rivera v. Turabo Med. Ctr. P'ship,* 415 F.3d 162, 167 (1st Cir.2005)).

■ Relevant case-law focuses on the first and third prongs of the test set forth by *Otero,* supra. First turning to a duty owed, Puerto Rico courts have explained the duty owed to a patient as that level of care which, recognizing the modern means of communication and education, meets the professional requirements generally acknowledged by the medical profession. *Otero,* 428 F.Supp.2d at 46; *see also Rivera v. Turabo Med. Ctr. P'ship,* 415 F.3d

162, 167 (1st Cir.2005) (citing *Lama v. Borrás*, 16 F.3d 473, 478 (1st Cir.1994)) (quoting *Oliveros v. Abreu*, 1 P.R. Offic. Trans. 293, 101 P.R. Dec. 209, 226 (1973)). The standard is considered national and should generally be proven through expert testimony. *Otero*, 428 F.Supp.2d at 46.

■ In terms of the standard of care owed specifically by nurses, the Puerto Rico Supreme Court has held that a nurse must use a degree of reasonable care to avoid causing unnecessary harm to the patient, and such degree of care must be equal to the degree of care exercised by other nurses in the locality or similar localities. *Blas Toledo Y Otros v. Hospital Nuestra Señora De La Guadalupe*, 146 D.P.R. 267, 307 (1998), (citing *Castro v. Municipio De Guánica*, 87 D.P.R. 725, 728–729 (1963)). In Puerto Rico, nurses and paramedic personnel have the unavoidable duty to fulfill medical orders with the required urgency and in accordance with each patient's particular circumstances. *Ponce v. Ashford Presbyterian Community Hosp.*, 189 F.R.D. 31, 33 (D.P.R.1999) (internal citations omitted).

■ Next, turning to the causation element, the law of Puerto Rico holds that to establish causation, a plaintiff must prove by a preponderance of the evidence, that "the [medical provider's] negligent conduct was the factor that 'most probably' caused harm to the plaintiff." *Rivera v. Turabo Med. Ctr. P'ship*, 415 F.3d 162, 168 (1st Cir.2005). Causation usually cannot be found based on mere speculation and conjecture. Expert testimony is generally essential in order to clarify complicated medical issues that are more prevalent in medical malpractice cases than in standard negligence cases. *Otero*, 428 F.Supp.2d at 46.

## A. *LIABILITY OF DEFENDANT HEAM'S NURSES*

■ Defendants HEAM and Admiral move the Court for summary judgment, arguing that HEAM's nurses merely complied with the orders given to them by Defendant Ramírez, the private physician of Plaintiff Pagés in charge of the birth. As such, Defendants HEAM and Admiral argue that Defendant Ramírez is solely responsible for any damages alleged by Plaintiffs.

■ While it follows that nurses must comply with a physician's commands in order for hospitals to run smoothly, Puerto Rico law clearly requires nurses to meet certain independent standards of care. The law requires nurses to use a degree of care to avoid causing unnecessary harm to their patients. *Blas Toledo*, 146 D.P.R. at 307. According to Plaintiffs' expert witnesses, Dr. Crawford and Dr. Bernard Nathanson ("Dr.Nathanson"), HEAM's nurses departed from this standard of care in several ways.

First, Dr. Crawford stated in her report that HEAM's nurses failed to discontinue the administration of pitocin, or to notify the physician to do so, in the presence of signs of fetal distress. According to Dr. Crawford, it is the duty of a nurse to monitor the administration of pitocin and to either stop it herself, or alert the doctor to do so, when the mother is experiencing frequent contractions and there is a problematic fetal heart rate. This occurred during the birth of Plaintiff Giovanni, and Dr. Crawford reported that there is no indication from the medical records that HEAM's nurses adhered to the standard of care required of them with regard to the administration of pitocin.

Moreover, Dr. Crawford testified in her deposition that, given the frequency and duration of Plaintiff Pagés' contractions, the pitocin should not have been adminis-

tered to Plaintiff Pagés in the first place. Dr. Crawford stated that HEAM's nurses should have alerted the anesthesiologist or the obstetrician to this fact. If the physicians did not heed the nurses' warnings, the nurses could have continued voicing their concerns up the nursing ladder of responsibility, an industry guideline for nurses to follow when they question an order from a commanding physician. Plaintiffs allege that Defendant HEAM's nurses did not follow this protocol, and instead blindly followed the instructions of Defendant Ramírez, thereby causing irreparable harm to Plaintiffs.

Both Dr. Crawford and Dr. Nathanson, Plaintiffs' obstetrical expert, reported that HEAM's nurses departed from the standards of care required of them by failing to place an internal heart monitor during the delivery of Plaintiff Giovanni. According to these experts, it is the role of a nurse to monitor the baby's heart rate during delivery. If the heart rate shows a problematic pattern, the nurse should place an internal heart monitor, or ask the physician to do so. When a pattern of fetal heart distress has been found using an external device, an internal monitor should be placed to obtain a more consistent recording. Here, Dr. Crawford and Dr. Nathanson stated in their reports that the external monitor showed that Plaintiff Giovanni was experiencing fetal distress, yet there is no evidence in the record that the nurses either 1) placed an internal heart monitor, or 2) asked the physician to do so.

Dr. Crawford also reported a departure from the standards of care on the part of both the nurses and the anesthesiologist.[2] The departure stemmed from a failure to follow-up on the epidural anesthesia given

to Plaintiff Pagés. It is the joint responsibility of the anesthesiologist and the nurses to monitor a patient's response after an epidural has been administered. If it is observed that a baby's heart rate drops, the mother should be turned onto her left side and fluids should be increased. These two steps are part of the resuscitation process that is the duty of the nurses. Additionally, it is the joint responsibility of the anesthesiologist and the nurses to administer a bolus of fluids prior to the placement of the epidural. Dr. Crawford stated in her report that HEAM's nurses and anesthesiologist departed from the standard of care by failing to administer the bolus of fluids to Plaintiff Pagés prior to the epidural, and failing to take the required follow-up steps after the epidural had been placed.

The Court agrees with Plaintiffs that the law does not treat nurses as "robots" in the hospital setting, and holds that Defendants HEAM and Admiral cannot escape liability by resting on the argument that the nurses were only following the orders of Defendant Ramírez. Thus, as to the liability imputed on Defendants HEAM and Admiral as a result of the acts or omissions of the nursing staff, the Court denies Defendants' motion for summary judgment.

### B. HOSPITAL AND PRIVATE PHYSICIAN LIABILITY

Defendants HEAM and Admiral further argue that a hospital cannot be held liable for the exclusive negligence of Defendant Ramírez, an unsalaried physician with hospital privileges who was first and foremost entrusted with the Plaintiff Pagés' health.

■ With regard to a hospital's liability towards its patients, the Supreme Court

---

**2.** The anesthesiologist is not a party to the lawsuit. It is also not clear from the record whether he was on HEAM's staff, or whether

he was a private physician with privileges at HEAM.

of Puerto Rico has firmly established that hospitals owe their patients that degree of care that would be exercised by a reasonable and prudent person in the same conditions and circumstances. *See Márquez Vega v. Martínez Rosado,* 116 D.P.R. 397, 404–405 (1985) (internal quotations omitted). Puerto Rico courts have held a hospital liable to its patients for malpractice "on account of a negligent act on the part of the institution's employees; consequently, the hospital's liability has been predicated on the vicarious liability doctrine." *Márquez Vega,* 116 D.P.R. at 405.

When a patient goes directly to a hospital for care and the hospital provides the patient with a physician, Puerto Rico courts have held that the hospital and the physician are jointly liable for any act of malpractice that may ensue. *Id.* at 406–407. However, the situation is different when a defendant physician is not an employee of the defendant hospital, but rather is granted the privilege of using the hospital's facilities for his private patients. When a patient goes directly to her physician's private office for care, agrees with him as to the care she is going to receive, and proceeds to a given hospital on the physician's recommendation merely because the doctor has admitting privileges at this hospital, the hospital cannot be held liable for the exclusive negligence of an non-employee doctor, who was first and foremost entrusted with the patient's health. *Id.,* at 408–409.

However, even under the circumstances described above, the hospital has the continuous obligation to protect the health of its patients by: (a) carefully selecting the physicians who are granted the privilege of using its facilities; (b) requiring that said physicians keep up-to-date

through professional advancement studies; (c) monitoring the labor of said physicians and taking action, when possible, in the face of an obvious act of malpractice; (d) discontinuing the privilege granted in the face of the repeated or crass acts of malpractice on the part of one of those physicians; and (e) keeping reasonably up-to-date on current technological breakthroughs. *Id.,* at 409–410 (internal quotations omitted). That is, a hospital cannot turn its back once a physician is granted privileges there; rather, it has an obligation to maintain and enforce high standards of practice for the physicians granted the right to use its facilities.

Also, the United States Court of Appeals for the First Circuit has held that when a hospital grants staff privileges to a physician and *shares in the profits* earned by that physician at the hospital, the hospital is also responsible for acts of malpractice committed by the physician. *Suárez Matos v. Ashford Presbyterian Community Hosp.,* 4 F.3d 47, 52 (1st Cir.1993) (emphasis added). In that situation, as matter of law the hospital is a joint actor in a joint enterprise. *Id.*

In its motion for summary judgment, Defendant HEAM argues that Plaintiffs cannot make a showing of malpractice against HEAM because HEAM is not liable for the medical negligence allegedly incurred by Defendant Ramírez, who is not an employee of HEAM, but merely holds privileges to use its facilities for the benefit of his private patients.[3] HEAM further claims that it complied with its obligations to protect the health of its patients and that its personnel did not deviate from the applicable standards of care.

The parties have stipulated that Defendant Ramírez was Plaintiff Pagés' private

---

**3.** The Court is not aware of any information on the record pertaining to the profit-sharing

structure of Defendants HEAM and Ramírez.

physician with admitting privileges at Defendant HEAM. However, the inquiry into HEAM's liability does not end there. The Court must determine whether HEAM complied with its obligations, including monitoring its physicians with privileges, to ensure the health of its patients.

In a medical malpractice action, issues of deviations from the medical standard of care are questions of fact that must be decided by the jury. *See Cortés–Irizarry v. Corporación Insular de Seguros,* 111 F.3d 184, 189 (1st Cir.1997). Plaintiffs, through their complaint and the expert testimony that followed, have raised several questions of fact regarding whether Defendant HEAM complied with its obligations to protect the health of its patients. For example, Plaintiffs' expert, Dr. Crawford, opined in her report that a delay in the administration of anesthesia to Plaintiff Pagés by Defendant HEAM's anesthesiologist unnecessarily prolonged the birthing process, thereby contributing to Plaintiff Giovanni's injuries. Dr. Crawford also stated in her report that Plaintiff Pagés was not administered a bolus of fluids prior to the administration of epidural anesthesia, which caused a significant drop in her blood pressure and affected Plaintiff Giovanni's oxygen flow. As such, Plaintiffs have shown that there are genuine issues of material fact for a jury to consider at trial that require the Court to deny Defendants' motion for summary judgment.

## V. *CONCLUSION*

In conclusion, the Court **DENIES** Defendants HEAM and Admiral's motion for summary judgment.

**IT IS SO ORDERED.**