Mirta **SANTANA OTERO,** individually and as legal guardian of incapacitated husband Domingo Vega Morales; The Conjugal Partnership between them; and Javier Vega Oliveras, Plaintiffs,

v.

**UNITED STATES of America,**
Defendant.

Civil No. 03–1817(DRD).

United States District Court,
D. Puerto Rico.

April 4, 2006.

---

Manuel San–Juan–Demartino, Manuel San Juan Law Office, San Juan, PR, for Plaintiffs.

Isabel Munoz–Acosta, United States Attorney's Office, San Juan, PR, for Defendant.

## AMENDED OPINION AND ORDER

DOMINGUEZ, District Judge.

Plaintiffs Mirta Santana Otero, individually and on behalf of her incapacitated husband Domingo Vega Morales, the Conjugal Partnership between them, and Javier Vega Oliveras ("plaintiffs") filed the present action for damages against the United States of America ("defendant") pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 ("FTCA") seeking damages for injuries that Domingo Vega Morales suffered on August 10, 2000 while being medically treated at the Emergency Room at the Veterans' Administration Medical Center in San Juan, Puerto Rico. Plaintiffs' complaint alleges that, on said date, the nursing and medical staff of the VA were negligent when they failed to adequately monitor and treat Mr. Vega's epilepsy, including multiple episodes of apnea which occurred as a consequence thereof, ultimately and directly led to his breathing arrest. This, in turn, resulted in anoxia and encephalopathy. *See Complaint*, Docket No. 1.

Mr. Vega's wife, Ms. Santana, the Conjugal Partnership formed between them, and Mr. Vega's son, Javier Vega, allege that, had this negligence been the result of the actions or omission of a private person or entity, the defendant would be liable to the plaintiffs for all damages caused thereby. Consequently, the United States is liable to them under the FTCA for all damages resulting from the negligent acts of the Veteran Administration's staff employees who failed to adequately medically monitor and treat Mr. Vega. *Id.* ¶¶ 34–35. On the other hand, defendant has denied any liability and affirmatively alleged that Mr. Vega's treatment was well within the standard of medical care, timely, adequate, and appropriate.

On November 21, 2001 and May 22, 2002, plaintiffs submitted the proper administrative claims (Standard From 95) to the United States. These claims were then sent to the Department of Veterans' Affairs. On February 13, 2003, the Department of Veterans' Affairs denied their claims, and a complaint was timely filed before the Court on July 30, 2003.

After pre-trial procedures, the matter was then tried before the Court in a bench trial during the month of June of 2005. During trial, plaintiffs brought forth evidence to establish the purported medical malpractice liability base on two alternative theories. In the first place, plaintiffs presented the testimony of co-plaintiffs Mirta Santana to directly contradict that which is reflected in Mr. Vega's medical records. In order to establish said contradictions, plaintiffs aver that Mr. Vega was

improperly left unattended by the Veteran Administration up until he suffered the respiratory collapse that caused the anoxia and encephalopathy. Second, in the alternative, assuming the notations in said medical record were accurate, plaintiffs submitted the testimony of expert witness, Dr. Ben Gasirowski, sustaining that the Veteran Administration's ER nurse's failure to monitor and attend Mr. Vega upon the onset of apnea periods, constituting a deviation from the required legal standard of care applicable in Puerto Rico. Nurse Lilliam Santiago, the nurse in charge of Mr. Vega during the course of the events, testified on behalf of defendant to contradict Ms. Santana's testimony and to corroborate the notations found in the medical record. Furthermore, defendant brought forth expert testimony through Dr. Carlos Gomez Marcial to demonstrate that the treatment and care afforded to Mr. Vega fully complied with the applicable legal standards of care. All parties presented evidence at trial as to the nature and extent of the damages alleged in the complaint.

After trial, the Court requested both parties to file memoranda of law and proposed findings of fact and conclusions of law. (Docket No. 52, 62, 63, and 64).

## I. FINDINGS OF FACT

At the time of the operative facts, plaintiff Domingo Vega was a Veteran with an established 100% disability due to his epilepsy. While serving in the United States Armed Forces in 1980, Mr. Vega suffered a fall which triggered the onset of his epileptic condition. Tr. 6/15/2005 at 13, ln. 1–5, (Docket No. 59). On August 10, 2000, plaintiff Mr. Vega suffered an epileptic seizure at home. He fell and consequently hit his head. His wife, plaintiff Ms. Santana, upon finding him, hurried him to the Veteran Administration's ER as she had done many times before, around two to three times a month. *Id.* at 17, ln. 8–12;

17–25. Mr. Vega and his condition were well known to the Veteran's Administration's ER staff. Tr. 6/13/2005 at 9, ln. 1–4 (Docket No. 57). Once having arrived at said ER, Mr. Vega was attended and treated at all times by nursing and medical personnel employed at the Veteran Administration who were, in turn, acting within the scope of their office and/or employment when treating Mr. Vega.

When they arrived at the ER, Mr. Vega was placed on a stretcher and a medical student placed a cervical collar around his neck. Docket No. 59, at 21, ln. 13–16. Another nurse took his vital signs and proceeded to record them on the medical record. *Id.* at 19, ln. 6–8. About an hour later, a doctor interviewed Ms. Santana and took Mr. Vega's medical history as well as the events that brought him to the ER that day. *Id.*, ln. 17–20. The doctor then assured Ms. Santana that he would leave orders in order for Mr. Vega the required treatment. *Id.*, ln. 24–25. Ms. Santana then remembers the ER personnel taking blood samples, but considerable time elapsed, thereafter, without Mr. Vega receiving any treatment. *Id.*, at 20, ln. 2–5. Consequently, Ms. Santana complained to the nurse in charge about the fact that Mr. Vega had not been provided with an IV conduit. *Id.*, ln. 10–12. The nurse replied that it would be taken care of soon and that they knew what they were doing as "they were professionals." *Id.*, ln. 22–24. According to Mrs. Santana, "more time transpired and Domingo's skin tone started to change"; he became more yellowish and was sweaty and hoarse. *Id.* at 21, ln. 1–5. She noticed that he began to breathe with some difficulty. *Id.*, ln. 18–20. Thus, Ms. Santana complained to the nurse once again. *Id.*, ln 22. It was sometime around two hours after having first arrived at the ER that Mr. Vega started having breathing difficulties, including "apnea for periods". *Id.*, at 22, ln.

12–14, 23. Ms. Santana testified that at that time her husband still "did not even have an IV [conduit] on, nor oxygen, nor was he connected to a monitor." *Id.*, at 23, ln. 4–5. **"Nothing, absolutely nothing had been done to him except for the [taking of] vital signs and the samples that had been taken."** *Id.*, ln. 5–7.

Ms. Santana also testified as to noticing, from a distance, that Mr. Vega no longer had the cervical collar and was lying on his back completely flat. *Id.*, at 25, ln. 23–25. She further noticed that his color had changed and his fingernails and lips had turned completely blue. *Id.*, at 26, ln. 1–13. Mr. Vega's eyes were halfway open and his pupils were dilated and he did not have any respiratory assistance. *Id.*, at 26, ln. 15–18. She further testified that a nurse was standing right next to him, and when Ms. Santana inquired what was happening to her husband, the nurse merely stated that he "is very ill". *Id.*, ln. 23–25. Due to Ms. Santana's agitated state, the nurse then turned to Mr. Vega and realized that the condition described by Ms. Santana (non-responsive and in respiratory arrest) was acute and called the doctor and staff. *Id.*, at 27, ln. 19–22. The medical staff then proceeded to resuscitate him, and Mirta was escorted outside by security. *Id.*, ln. 24–25. While outside, a male nurse by the name of Camacho, whom Ms. Santana had known for a long time, told her that they were attempting to do everything medically possible for her husband. *Id.*, at 28, ln. 10–13. Twenty minutes went by, and Mr. Camacho came back and told her that she should call the family, provid-

ed that Mr. Vega was probably not going to make it because they had been resuscitating him for twenty minutes and he failed to react. *Id.*, at 28, ln. 16–20. Five minutes later, Camacho returned and told her Domingo had reacted; then he put his hand on Mirta's shoulder and said "I know that they dealt wrong here". *Id.*, at 28, ln. 22–25.[1]

The Court received further evidence and carefully reviewed the medical records of Mr. Vega corresponding to his visit to the Veteran Administration Medical Center Emergency Room on August 10, 2000 (Joint Exhibit VII). It is apparent that these medical records contrast in several critical aspects with plaintiff Ms. Santana's testimony. According to the nursing notes subscribed by nurse Lilliam Santiago (VA Form 510), Domingo Vega was received at 2:00 P.M., "somnolent and hypoactive". Mr. Vega was described in the Medical Certificate (VA Form 10–10M) as having been received at 1:40 P.M. However, at that time he was "not responding verbally or tactile". At arrival to the ER, his pulse was noted to be at 88, respiration at 21 and blood pressure at 113/86. The Medical Certificate describes "refined rhonchi from upper airway" but no cyanosis. The ER physician wrote orders for oxygen by nasal cannula, a cervical collar, cervical x-rays, and various blood tests. According to Nurse Santiago's note, Domingo was placed on a cardiac monitor, given IV fluids and oxygen by nasal cannula, and pulse oximetry was taken showing 97% saturation. The nurse's note states that

---

1. The Court received this statement in evidence as a party admission, following the holding of *Brookover v. Mary Hitchcock Memorial Hospital*, 893 F.2d 411, 420 (1st Cir. 1990). Nurse Camacho, an employee of the Veteran Administration Hospital since 1980, subsequently testified at trial as a rebuttal witness, and categorically denied making this statement. However, he admitted that he

"would never tell a patient's family member that somebody in the emergency room had done something wrong" because to do so "might put his job in jeopardy." Tr. 6/30/2005 at 38, ln. 2–8. After weighing the credibility of both witnesses, the Court finds that Mirta Santana's testimony regarding this admission was credible, and therefore discards Nurse Camacho's denial.

his pulse was 88 per minute at 2:00 P.M., 86 per minute at 2:25 P.M. and 80 per minute at 3:00 P.M. However, there is a lack of confirming electronic strips from the cardiac monitor to confirm these readings, notwithstanding that the patient was on the monitor according to nurse Santiago's notes. Nurse Santiago further wrote that at 3:34 P.M. the patient "develops apnea periods" and his pulse falls to 60. Although according to the nurse's note the patient was on "continued in [sic] close observation", at 3:36 P.M., another nurse "Mrs. Pérez RN, observed patient in respiratory distress". Pursuant to the Progress Note signed by Dr. Jaime Reyes at 3:50 P.M. (Joint Exhibit VII, at A–858), he "was called by nurse personnel that pt. was not breathing." He further stated that the patient was "found with no pulse [and] no breathing." Cardiopulmonary resuscitation ("CPR") was begun, and the patient received Advanced Cardiac Life Support ("ACLS").

The physician's orders state that ventilation began at 3:36 P.M. and that the patient was intubated at 3:40 P.M., approximately two minutes **after** going into respiratory arrest (a full six minutes after the patient was found to be experiencing "apnea periods" by Nurse Santiago). Mr. Vega then received atropine, epinephrine, bicarbonate and defibrillation shock. According to Dr. Reyes' Progress Note, after approximately 17 minutes the patient regained a pulse of 135, blood pressure of 110/60. He was placed on a mechanical ventilator and admitted to the Intensive Care Unit. He was stabilized, but, unfortunately, the permanent and severe damage to his brain had already been effectuated.

There are several critical items missing from the medical records. For example, during her testimony, Nurse Santiago stated that it was normal for a patient's family to register by signing some papers upon arrival at the ER. Tr. 6/28/2005, at 30, ln. 7–18. The medical record, however, is devoid of Mirta Santana's signature on a register. As stated *infra*, notwithstanding Nurse Santiago's claim that the patient was connected to a cardiac monitor since 2:00 P.M., there are no cardiac monitor electronic strips until 3:38 P.M. (four minutes after apnea symptoms developed, specially considering the admission of Nurse Santiago at deposition of having observed two or three apnea periods), after Domingo suffered respiratory arrest. Similarly, there are no computer printouts with time notations to evidence the pulse oximetry readings noted by Nurse Santiago. The Physician's Orders during ACLS also contains an alteration of the time notation in the upper left quadrant of the document. The original notation of 3:35 P.M. appears to have been altered to change the three into a five, finally reading 3:55 P.M. Nurse Santiago's nurse's note raises various troubling questions. During her trial testimony, Nurse Santiago insisted that she wrote her nursing note as the events were taking place. Yet the handwriting in medical records, as to the annotation of notes has a uniform quality, as if the notes had been written all at once. Furthermore, the time notations do not appear to have been written at separate times. There are two separate time notations that refer to 2:00 P.M., a clear unnecessary redundancy not adequately explained by Nurse Santiago. Other than the first time notation of 2:00 P.M., and the last one at 4:38 P.M., none of the others corresponds to a new line of handwriting. In other words, each of these separate time notations is written on the same line to an overlapping entry with the previous one. Expressed in other words, instead of making separate entries on separate lines, the record shows all entries utilizing the same line as the prior note.

During her trial testimony, Nurse Santiago's credibility was repeatedly impeached by her numerous contradictions with her previous deposition testimony. For example, at trial she testified that she was "absolutely sure" that she had previously interacted with Domingo Vega prior to the incident subject of this case, while during her deposition she denied any previous interaction. Tr. 6/28/2005, at 62, ln. 4–18. At trial she stated that Domingo's heart rate of 60 during the apnea episodes was "normal", while during her deposition she admitted that this value for a heart rate was "not normal". Id., at 52, ln. 4–25. At trial Nurse Santiago claimed she observed "one or two" periods of apnea in the patient, while in deposition she had testified that she had observed "two or three". Id., at 54, ln. 3–21. During her deposition she testified that she had received 2 weeks of training in the Veteran Administration as to ER procedures, while at trial she claimed it was 2–3 weeks. Id., at 28, ln. 7–25. During her deposition she admitted, as was normal conduct for the patient's family to sign a register at the triage area of the ER, contrariwise, at trial she negated knowledge as to said practice. Id., at 30, ln. 2–13. During trial she referred to the medical certificate as stating that the patient had a prolonged "post ictal" state, while during deposition she called it a "parietal" state. Id., at 35, ln. 6–13; 36, ln. 2–7. During trial she claimed to recognize Dr. Reyes' handwriting in the notation of oxygen saturation on the medical certificate, while during deposition, curiously, she stated that she "did not recognize it". Id., at 40, ln. 9–23. During trial she explained a notation of "narcolepsy" as "sleepiness", while during deposition she was completely unable to define the term. Id., at 43, ln. 1–6. Significantly, at the time of the events subject of this case, Nurse Santiago had relatively little experience as an ER nurse. She admitted during her testimony that, at the time of the events, she had no previous experience as a full time Emergency Room nurse prior to her nine-month stint at the Veteran Administration Hospital ER. Id., at 27, ln. 21–25. Moreover, on the day of the events, Nurse Santiago was circumstantially overwhelmed with other patients' care as the ER was crowded and busy. She testified that there were six or seven nurses in the ER taking care of approximately 42 patients, assuming the ER was full. Id., at 29, ln. 3–10.

Subsequent to the events subject of this case, Mirta Santana encountered difficulties in her attempts to obtain from the Veteran Administration copies of her husband's medical records. Plaintiff Santana testified that she requested a copy of the clinical file from the Veteran Administration "because [she] wanted to have [it] because [she] believe[d] that there had been negligence there." Docket No. 59, at 42, ln. 2–3. "On more than four occasions I went there, there was always mishaps, you know, either the documents were not available or they were not in order or they didn't have the custody of them." Id., at 42, ln. 6–9. She complained to the Veteran's Advocate, and was finally able to obtain "after two and a half, almost three years, through the services of an attorney—that clinical file, which I had already requested three years before, about a month or two after the events." Id., at 43, ln. 1–6.

Given the circumstances outlined above, the Court finds that the medical records in this case must be carefully scrutinized by the Court. Unlike Nurse Santiago, Ms. Santana did not repeatedly contradict her prior deposition testimony, and her demeanor at trial provided candor and credibility. Even defendant's own expert witness, Dr. Carlos Gómez Marcial, admitted on cross examination that if Ms. Santana's version of the events is given credence, and Mr. Vega did not receive proper oxy-

genation, IV fluids, pulse oximetry or cardiac monitoring, and suffered episodes of apnea all during a period of forty five minutes without the nurses notifying the physician, he "should have been taken care of properly" and the failure to do so was "poor nursing care". Tr. 6/28/2005 at 102, ln. 11–25 to 103, ln. 1.

The Court finds credible the testimony of Mirta Santana to the effect that her husband was essentially unattended during critical periods at the ER, thus, suffering apnea from approximately 2:45 P.M. (discoloring in the face, lips, fingers, and finger nails; nurse admitted as to "two or three apnea periods") until his subsequent arrest at 3:36 P.M. These facts establish that the nursing care provided by Nurse Santiago was deficient and below the required standard of care as required under the law.

On the other hand plaintiffs' medical expert, Dr. Ben Gasirowski, testified that he formulated his opinions in this case based on the assumption that the medical records were accurate. Dr. Gasirowski, who currently serves as the Medical Director of St. Luke's Urgent Care System at St. Luke's Hospital in St. Louis, Missouri, has more than twenty years experience as an attending Emergency Physician. He is licensed to practice medicine in Missouri, California, and Illinois. He is Board Certified in both Emergency Medicine and Internal Medicine. Dr. Gasirowski is a Fellow of the American College of Emergency Physicians, a Diplomat of the National Board of Medical Examiners, and has served as a Clinical Instructor of Emergency Medicine at the Washington University School of Medicine and the St. Louis University School of Medicine. Given these credentials, Dr. Gasirowski was qualified by the Court, without objection, to opine as to the medical treatment provided to Domingo Vega in this case. Tr. 6/13/2005 at 7, ln. 17–18 (Docket No. 57).

Gasirowski's Expert Report (**Joint Exhibit XII**) concludes, based exclusively on his review of the medical records, that there was a deviation from the standard of care in the following areas:

a. **Upon the first sign of apnea in this patient, Nurse Santiago "needed to immediately advise the Emergency Department physician of the apnea episode."** [2] This was **"necessary to ensure proper ventilation and oxygenation of the patient, including potential endotracheal intubation."** Apnea in this patient "was a life threatening emergency." Had the physician been notified, the patient "would have been intubated and would not have gone into cardiorespiratory arrest." The subsequent brain damage suffered by Mr. Vega (anoxic encephalopathy) "occurred secondary to the lack of oxygen circulation to the patient's brain during the cardiorespiratory arrest in addition to inadequate ventilation during the apnea periods". **This patient was noted to have multiple apnea periods over a two minute span when no treatment or intervention was performed.** Joint Exhibit XII, at 1–2.

b. The standard of care required this patient to be **closely observed at the time of the initial apnea period.** The patient was **left alone during the first noted apnea periods,** and found by another nurse in respiratory distress and not breathing by another nurse. "Leaving the patient alone without supervision was a deviation of the standard of care." [3] Joint Exhibit XII, at 2.

---

**2.** Nurse Santiago admits in her deposition to having observed "two to three" apnea periods which she failed to report immediately to the attending physician.

**3.** The Court adds that the leaving of the patient with this medical history without supervision once stabilized, even for short periods, there existing no connections of the patient to

c. The standard of care required that **pulse oximetry readings be taken during the apnea periods "to evaluate the patient's respiratory status"**. Had those readings been taken, "a deterioration of the patient's respiratory status would have been observed and acted upon preventing his cardiopulmonary arrest and subsequent anoxic brain injury." The standard of care required that vital signs be obtained at the onset of the apnea periods, including the respiratory rate. Had the respiratory rate been evaluated, "the deterioration of the patient's respiratory status would have been obtained and acted upon." Joint Exhibit XII, at 2.

Moreover, Dr. Gasirowski supported his opinions by making specific references to the applicable guidelines issued by the American College of Emergency Physicians (hereinafter referred to as "ACEP"). He testified that the ACEP Clinical Policy for the Initial Approach to Patients Presenting with Altered Mental Status was the required medical treatment to be performed onto a patient such as Mr. Vega who presents to the ER in a prolonged post ictal state. Docket No. 57, at 27, ln. 1–4. Dr. Gasirowski explained that it was important to "do vital signs, specifically respiratory rate, check for abnormal respirations, which would be apnea in this case,

and to, most importantly, **assess the airway**." *Id.*, ln. 7–10. This is so for, in the event of abnormal respiration—as was the case at bar—, the ER physician needed to be immediately notified so that he or she could determine "whether you can give just a little bit more oxygen, say with a face mask, or if you have to proceed to intubate the patient with a tube to give them oxygen if they're not breathing." *Id.*, at 27, ln. 11–14. Dr. Gasirowski also referred to the ACEP Clinical Policy for the Initial Approach to Patients Presenting with a Chief Complaint of Seizure Who are not in Status Epilepticus. He stated that this policy is "very specific in stating [. . .] that apnea is a life threatening situation in patients that have had seizures." *Id.*, ln. 19–21. Dr. Gasirowski further clarified that the guideline was not meant to address the patient who is in an active seizure, but rather a patient, not unlike Mr. Vega, who is in a post ictal state and who has apnea, hypoxia and hypotension. *Id.*, at 28, ln. 4–10.

Defendant attempted to rebut Dr. Gasirowski's opinions through the testimony of Dr. Carlos Gómez Marcial, a non-board certified emergency physician who currently serves as the Director of the Emergency Room at the Auxilio Mutuo Hospital.[4] Dr. Gómez's opinion letter (**Joint Exhibit II**) contends that "Mr. Vega was

vital signs such as oximetry readings, pulse, and respiratory rates, thus precluding the possibility of timely endotracheal intubation of the patient once the apnea episodes began, was unfortunately decisive in this case.

4. The plaintiff has moved to strike Dr. Gomez's testimony for failure to completely disclose all cases in which he had provided expert testimony at trial or deposition within the last four years, as required by Fed. R.Civ.P. 26(a)(2)(B). The Court deems this matter **MOOT** since the Court after evaluating both testimonies provides Dr. Gasirowski more weight and credibility than Dr. Carlos Gomez Marcial. After all, both medical opin-

ions are admissible notwithstanding that one expert may have a specialty in the area as opposed to the other medical expert and/or be Board certified on the specialty as opposed to the other expert. *See Gaydar v. Sociedad Instituto Gineco–Quirurgico y Planificacion Familiar*, 345 F.3d 15, 24 (1st Cir.2003) ("The proffered expert physician need not be a specialist in a particular medical discipline to render expert testimony relating to that discipline. [In essence,] the issues raised go to the weight of the testimony and not to the Daubert exclusion of the same."). Since both medical opinions are admissible, the matter is one of weight of the testimony of the experts.

well evaluated and treated by nursing and Medical Staff" at the Veteran Administration Hospital and that there was "no breach in the standard of care." Joint Exhibit II, at 3. During the course of his testimony, Dr. Gómez admitted at trial that Domingo Vega's post ictal state was an "altered mental status", and that during the post ictal state "the standard of care requires the emergency room physician to be concerned about the patient's airway." Tr. 6/27/2006 at 110, ln. 9–25; 111, ln. 1 (ACEP deems as first consideration "airway adequacy"). This is so because "the post ictal state is characterized by unresponsiveness, muscular flaccidity and excessive salivation that can cause stertorous breathing and partial airway obstruction." *Id.*, at 111, ln. 2–6. Dr. Gomez admitted that the ACEP guideline for patients with altered mental status states that for a patient such as Domingo Vega, **"the first consideration should be airway adequacy"**. *Id.*, ln. 7–13.[5] He also admitted that Domingo Vega presented with a partial airway obstruction due to secretions, which are common in the post ictal state. *Id.*, at 112, ln. 2–9. Dr. Gómez further admitted that when Mr. Vega developed apnea, this was clearly a change in status. *Id.*, ln. 11–15. He then agreed that apnea can significantly compromise the levels of oxygen in the patient's blood. *Id.*, ln. 16–19. He conceded that the ACEP guidelines refer

to apnea as a "life threatening emergency", and that "some apneic periods in the post ictal state can be a sign of impending respiratory collapse." [6] *Id.*, at 113, ln. 2–7 to 115, ln. 10–13. Most significantly, Dr. Gómez admitted that in this particular case it is possible that this patient developed a life threatening situation because of the apneic periods. *Id.*, ln. 8–11.

Dr. Gómez critically accepted that as a physician, if he had a patient in the medical state presented by Domingo Vega, he would want the nurse to tell him if the patient began suffering apnea. *Id.*, at 115, ln. 20–25. This is so because the physician is in a better position than the nurse to judge whether the apnea is life threatening. *Id.*, at 117, ln. 16–21. During his direct examination, Dr. Gómez was equivocal and hesitant in his testimony as to whether the ER physician should have been immediately summoned by the nurse upon first observing patient's apnea. He testified that it would have been advisable for nurse Santiago to have called in the physician "[a]nytime, really… [i]t could have been immediately, it could have been two or three minutes later… [d]espite his apneic periods, he is breathing spontaneously so at sometime the physician should have been summoned to check the patient". *Id.*, at 92, ln. 18–22. Dr. Gómez also attempted to suggest that the damages suffered by Domingo were unavoid-

5. Under this admission, and as per ACEP guidelines, a plausible alternative could have been to intubate Mr. Vega upon arrival at the ER in order to assure proper "airway adequacy". Nevertheless, placing a nurse to merely observe him is clearly insufficient considering that the patient was not connected to critical instruments to verify his respiration and heart rate (no verification of instrument connection was supplied).

6. Dr. Gómez claims at page 2 of his opinion letter that "apneic episodes without complications in patients with generalized clonicotonical seizure are normal events" and "intuba-

tion is not the standard of care." During his trial testimony, he insisted that apnea is "normal" in a patient who is in the post ictal phase after a seizure, and even assured the Court that this phenomenon is "amply documented in the medical literature". Tr. 6/27/2006, at 103, ln. 18–23. He was unable, however, to provide a single reputable medical authority to document this claim. *Id.*, at 104, ln. 5–11; 106, ln. 5–11. The Court has found no independent medical authority that supports the proposition that apnea is not critical and should be lightly taken during an epileptic patient's post ictal state.

able, by speculating that even if the nurse had immediately summoned the E.R. doctor, "it will probably take two or three minutes for [the doctor] to get there" and hence it "probably wouldn't have done any difference" and "probably the patient would have arrested in [his] face". *Id.*, at 124, ln. 19–24; 125, ln. 1–3. On cross examination, however, Dr. Gómez admitted that if the ER physician had been summoned immediately upon noticing the apneic periods, he would have been able to decide whether intubation or ventilation of the patient was necessary. *Id.*, at 118, ln. 2–16. **As he himself explained, intubation would have allowed the physician to ventilate the patient easier in order to avoid hypoxia.** *Id.*, ln. 17–15; 119, ln. 1. In this case, Dr. Gómez admitted that he does not know whether Domingo had the criteria for intubation once the apnea began. *Id.*, at 119, ln. 7–10. As stated in Rosen's *Emergency Medicine*, at page 3 of Dr. Gómez's opinion letter, "the decision to intubate is often based on what is anticipated to happen, rather than simply the patient's current condition." It is up to the ER doctor, not the nurse, to make the decision based on what is anticipated to occur. *Id.*, at 120, ln. 19–23.[7] As Dr. Gómez admitted during cross-examination, however, should the physician not have timely knowledge what is medically transpiring, he cannot make the critical decision. *Id.*, at 120, ln. 24–25; 121, ln. 1. The doctor relies on the nurse to give him up to date information on the patient's status,

which is "absolutely critical". *Id.*, at 121, ln 2–5. If the nurse observes something that the physician needs to take into account, "it is the nurse's responsibility to advise the physician if she understands the patient is in jeopardy." *Id.*, ln. 6–10. Most critical, Dr. Gómez testified during cross examination that Nurse Santiago's failure to advise the ER physician that Domingo Vega was suffering apnea "probably was not the best judgment[.]" *Id.*, at 123, ln. 1–3.

As mentioned above, the Court harbors serious doubts regarding the accuracy of the medical records in this case, given the dramatically contrasting testimony of plaintiff Mirta Santana. Even assuming the medical records to be accurate, however, the Court finds that Dr. Gómez could not credibly justify Nurse Santiago's admitted failures in this case. Under the ACEP guidelines, Domingo Vega was a patient at risk for airway problems and should have been monitored closely from the beginning, particularly when the medical staff chose not to intubate from the very beginning (ACEP guidelines).[8] As Dr. Gómez admits, when Domingo developed apnea it was a potentially life threatening emergency. The Court agrees with Dr. Gasirowski that Nurse Santiago should have monitored Domingo's vital signs, taken pulse oximetry and advised the ER physician immediately upon the onset of apnea in the patient. **The Court is deeply troubled by Nurse Santiago's admission**

---

7. Notwithstanding, it is the Court's opinion, considering Mr. Vega's prior reiterated epileptic medical episodes at the Veteran Administration's ER, that, should the patient have been timely intubated, lack of oxygen occurrence would have been minimized. Under the ACEP guidelines for patients with "altered mental state", as was accepted by Dr. Gómez, taking into account the past history of serious epileptic attacks suffered by the patient, "the first consideration" for a patient "should be airway adequacy". Tr. 6/27/2006, at 111, ln.

7–9. Dr. Gómez further admitted the existence of a partial airway obstruction due to secretions which are common in Mr. Vega's history. This, not only dictated to clear the airway, but also clear the airway at arrival at the ER.

8. A nasal cannula provided to plaintiff falls short of providing "airway adequacy" since he had secretions which were partially obstructing the airway.

that, upon observing Domingo's apnea at 3:34 P.M. (two or three episodes), she went off to perform other duties, and it was another nurse—Nurse Perez—who realized that Domingo had stopped breathing at 3:36 P.M. This omission by Nurse Santiago was not only poor judgment; it undoubtedly fell below the standard of care. The Court specifically finds that, because apnea can be a life threatening emergency, the standard of care required Nurse Santiago to immediately summon the ER physician upon first observing the patient's apnea, particularly since the patient had not been oxygenated since the inception. The Court further finds that Nurse Santiago's failure to immediately summon the physician constituted a breach of the standard of care. The Court finds that Nurse Santiago's failure to act in the face of a medical emergency was negligent, and that her negligence was the proximate cause of plaintiff Domingo Vega suffering a lack of oxygenation, resulting in severe brain damage. Had the doctor been timely summoned, he could have properly assessed the situation and taken steps to immediately and adequately oxygenate Mr. Vega, thereby avoiding the hypoxia that caused Mr. Vega's severe brain damage. In sum, the Court finds that the ER nursing staff at the Veteran Administration Hospital breached its duty of care towards plaintiff Domingo Vega, either based on both the wholly credible, eyewitness testimony of plaintiff Mirta Santana, and the medical records and/or the expert opinion of Dr. Ben M. Gasirowski, supported, in turn, by admissions of defendant's own medical expert, Dr. Carlos Gomez Marcial.

## II. LIABILITY

Under the FTCA, the United States is liable for the negligent acts or omissions of its employees while acting within the scope of their employment, under circumstances where a private person would be liable pursuant to the law of the forum where the acts or omissions occurred. *See also United States v. Orleans,* 425 U.S. 807, 813, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976). The applicable law to define the standard of fault and recovery in the instant action is the law of the forum where the negligence occurs, in this case the law of Puerto Rico. *See Richards v. United States,* 369 U.S. 1, 15, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Shuman v. United States,* 765 F.2d 283, 288 (1st Cir.1985); *In Re N–500L Cases,* 691 F.2d 15, 27 (1st Cir.1982); *Zabala Clemente v. United States,* 567 F.2d 1140, 1143 (1st Cir.1977). The statute that governs the liability of a physician in a medical malpractice suit is Article 1802 of the Puerto Rico Civil Code. *See* P.R. Laws Ann. tit. 31 § 5141; *see also Vda. De López v. ELA,* 104 PR Dec. 178, 183 (1975).

In the required analysis, the court examines the Puerto Rico Civil Code, which states, "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. tit. 31 § 5141 (1991). "Under this proviso, three elements comprise a prima facie case of medical malpractice." *Cortes–Irizarry v. Corporacion Insular De Seguros,* 111 F.3d 184, 189 (1st Cir.1997). Following that line, thus, in order to prevail on a medical malpractice claim under Puerto Rico law, "a party must establish (1) the duty owed; (2) an act or omission transgressing that duty; and (3) a sufficient causal nexus between the breach and the harm." *Marcano Rivera v. Turabo Medical Center Partnership,* 415 F.3d 162, 167 (1st Cir.2005); *see also Rojas–Ithier v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de P.R.,* 394 F.3d 40, 43 (1st Cir.2005); *Cortes–Irizarry v. Corporacion Insular De Seguros,* 111 F.3d at 189; *Lama v. Borras,* 16

F.3d 473, 478 (1st. Cir.1994); *Rolon–Alvarado v. Municipality of San Juan*, 1 F.3d 74, 77 (1st Cir.1993); *Torres Nieves v. Hospital Metropolitano*, 998 F.Supp. at 136.

a) *Duty:*

The duty owed to a patient has been explained by the Puerto Rico courts as "(t)hat (level of care) which, recognizing the modern means of communication and education, . . . meets the professional requirements generally acknowledged by the medical profession." *Marcano Rivera*, 415 F.3d at 167–68 (citing *Lama v. Borras*, 16 F.3d 473, 478 (1st Cir.1994) (quoting *Oliveros v. Abreu*, 101 P.R. Dec. 209, 226 (1973)). This standard is considered national and must be proven through expert testimony.

As the Court amply discussed above, plaintiffs' expert explained that the standard of care requires that vital signs be taken to count the respiratory rate of the patient in order to ascertain if the patient is breathing; take pulse oximetry to verify if the patient needed to be supplied with oxygen through intubation; constant observation to secure that the patient would start breathing again; and immediately notify the physician at the onset of the first apnea episode. Docket No. 57, at 17, ln. 5–24. Dr. Gasirowski's testimony was interestingly corroborated by defendant's own medical expert, Dr. Gomez Marcial, who testified that Nurse Santiago's failure to advise the ER physician that Domingo Vega was suffering apnea was probably not the best judgment. Tr. 6/27/2006 at 123, ln. 1–3. In the present case, the Court has considered the various omissions and irregularities in the medical record in assessing the credibility of Nurse Lilliam Santiago. After carefully reviewing all the evidence, the Court concludes that Nurse Santiago breached her duty of care towards Domingo Vega. Upon the first sign of apnea in her supervised pa-

tient, the standard of care required Nurse Santiago to closely observe and monitor Domingo Vega and immediately advise the physician in charge of the apnea episodes and that the patient was not properly oxygenating. Failing to monitor and document the patient's vital signs, and leaving the patient alone without supervision, constituted deviations from the standard of care. Further, and most critical, upon the first sign of apnea, Nurse Santiago had a duty to immediately advise the Emergency Department physician of the apnea episode. Immediate action was necessary to ensure proper ventilation and oxygenation of the patient, including potential endotracheal intubation. Apnea in this patient was a life threatening emergency. Based on the above stated facts, the Court concluded that Veteran Administration failed it's duty to care for Mr. Vega.

b) *Causation:*

■ Ordinarily, causation cannot be found based on mere speculation and conjecture. Expert testimony, consequently, is generally essential in order to clarify complex medical issues that are more prevalent in medical malpractice cases than in standard negligence cases. *See Marcano Rivera*, 415 F.3d at 168; *see also Rojas–Ithier*, 394 F.3d at 43. Hence, a plaintiff must establish, by a preponderance of the evidence, that the nurse's negligent conduct was the factor that most probably caused the harm suffered by Mr. Vega. *Id.*

According to the Medical Certificate (VA Form 10–10M), Mr. Santana was well known to the ER staff due to his recurrent seizures and a prolonged post-ictal state, with its attendant airway problems. There is no question that Mr. Vega's injuries were caused by Nurse Santiago's negligent monitoring. In fact, Nurse Santiago left plaintiff unattended and it was

another nurse who found Mr. Vega in arrest. Both experts, plaintiffs' and defendants', agreed that the nurse in charge had to summon the physician as soon as the first apnea episode transpired; that Mr. Vega's airway was of concern provided his altered mental state; that apnea is a life threatening symptom; and that, if summoned immediately, the physician could have intubated in order to prevent the lack of oxygen that Mr. Vega suffered. Domingo Vega's brain damage (anoxic encephalopathy) was proximately caused by Nurse Santiago's breach of her duty of care. Had the E.R. physician been timely notified, Domingo Vega would have been rapidly intubated, ventilated and treated, in order to avoid anoxia. Most likely, Plaintiff would not have developed cardiorespiratory arrest. Nurse Santiago's breach of her duty of care proximately caused pain, suffering and emotional distress to Mirta Santana, and Javier Vega Accordingly, the Court finds that there is a direct causal link between Nurse Santiago's insufficient monitoring of Mr. Vega and the permanent brain damage which ensued.[9]

## III.  DAMAGES

a) *Mirta Santana Otero:*

█ Prior to the incident subject of this case, Mirta Santana had a close, loving relationship with her husband Domingo. They met in 1984, while they were both working at the Technological College. Docket No. 59, at 4, ln. 1–5. They dated for about two years, and Mirta fell in love with him "because of the qualities he possessed." *Id.,* at 5, ln. 13–17. The couple enjoyed a mutual love of graphic arts. *Id.,*

ln. 23. Domingo and Mirta were married in 1986.

On August 10, 2000, Mirta Santana suffered the shock and anguish of finding her husband of fifteen years in cardio respiratory arrest. Ms. Santanta became understandably agitated, and was escorted outside of the Veteran Administration's ER by security where she agonized, awaiting word on her husband. She called her pastor and several people in her desperation. *Id.,* at 30, ln. 22–23. After Domingo was stabilized and transferred to the Intensive Care Unit, she spoke to his doctors and was there "24 hours a day". *Id.,* at 33, ln. 1–2. Every time she visited with him, he observed his "condition, he had been intubated, there was no response...[o]ne time he even had a seizure, he was convulsing." *Id.,* at 33, ln. 12–16. As the permanent status of his condition slowly sunk in, Mirta "could not believe that this was happening to [her] because [she] did everything within [her] reach as a good wife to make sure that he was taken care of." *Id.,* ln. 23–25; 34, ln. 1.

The Court finds that Mirta Santana has been traumatized by her husband's experience at the Veteran Administration Hospital. So much so, that since January 26, 2001, when he was discharged, Mirta has not hospitalized Domingo at the Veteran Administration facilities. When asked why, she responded: "because I don't have any trust in them, because that's where the negligence took place, number one...[a]nd number two, we were there for five and a half months, and I was able to observe...[t]hey don't have the personnel...[t]hey have either two graduate nurs-

---

**9.** Notwithstanding that the Court finds a violation of duty pursuant to Dr. Gasirowski's expert testimony based on the negligence of the nurse as herein described, there is sufficient evidence on the record to conclude that the entire episode could have been avoided should the patient have been intubated upon

arrival at the ER, as well as having been properly connected to monitoring devices to confirm vital signs such as respiration, heart and pulse rate, and blood oxygenation (ACEP guidelines). Neither of these alternatives were taken.

es or three practical nurses for an entire floor, for an entire ward, which is not enough, and much less for the type of care that Domingo requires." *Id.,* at 54, ln. 11–25. Over the course of the last five years, Mirta has been by her husband's side every single day. She spends "six, seven hours" a day with her husband. *Id.,* at 56, ln. 19–20. Otherwise, she "almost always" spends the rest of her time "looking for something for him, something that we run out of on an emergency basis, or going to the labs." *Id.,* ln. 23–25. Ms. Santana enjoys "very little" time on leisure activities; never goes to the movies, goes shopping or relaxes with friends. *Id.,* at 57, ln. 6–19. Ms. Santana did visit a psychologist briefly, but she only "fe[lt] more depressed because it was so expensive[.]" *Id.,* at 58, ln. 1–6. Mirta Santana testified that she "used to have a life, such as the one that maybe all of you have, time for yourself, for your wives or your spouses, your children, for your time, and now all I have is my husband there bedridden who is in need of constant 24 hour care." *Id.,* ln. 10–14. This "is very depressing for me because I still consider myself to be someone who could enjoy a life, you know." *Id.,* ln. 21–23. Her husband is now "like [her] baby." *Id.,* ln. 25. She has to constantly be "feeding him, changing him, taking care of him." *Id.,* at 59, ln. 1–4. She now spends her lifetime caring for him, responding for his medical needs and supervising the private nurses that take care of him.

The Court finds that Mirta Santana has become the primary caregiver for an individual who now requires twenty-four medical hour care. Ms. Santana, thus, suffered and continues to suffer grief, depression and mental anguish as a result of her husband's condition, and that, given the extraordinary nature of her loss, the sum of **$3,000,000.00** constitutes reasonable compensation for her past, present and future suffering.[10]

■ The Court finds that prior to the incident subject of this case, plaintiff Mirta Santana had a substantial work history. After various jobs as a nursing instructor and practical nurse, she was trained as an occupational nurse at a prestigious pharmaceutical company, Johnson & Johnson. *Id.,* at 9, ln. 2–25. In 1987, she went to work for Signal Caribe, where she continued for 12 years until the company left Puerto Rico in 1998. Subsequently, she developed breast cancer, and had to take time off from her search for work to undergo treatment. At the time of the events subject of the complaint, she had not finished her treatment. *Id.,* at 10, ln. 20–22. Although Mirta Santana's breast cancer has since abated and she is now free of the disease, the Court finds that because of the enormous demands placed upon her by her husband's needs, Mirta

---

**10.** The Court finds that the sum granted passes muster under the *Gasperini* Rule (*Gasperini v. Center of Humanities, Inc.,* 518 U.S. 415, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996)). That is to say, the award is not excessive involving medical malpractice cases for the same reasons expressed in the case of *Marcano,* 415 F.3d at 171–72 which holds that the Supreme Court of Puerto Rico does note intervene with awards unless they are "ridiculously low or exaggeratedly high". *Nieves Cruz v. Universidad de Puerto Rico,* 151 P.R. Dec. 150 (2000). In *Marcano,* the Court refused to alter an award of $4.0 million dollars to a mother whose life was shattered and suffered severe mental distress and anguish in the caring of a baby born with severe brain damages resulting from malpractice. The mother had to care for the baby for the rest of her life. Ms. Santana is similarly situated having to care for her husband for the rest of his life, as the mother of baby Fabiola in *Marcano,* finding herself at a relative young age (40's) at the time of the operative malpractice facts and considering that her husband has a potential life expectancy of 71 years.

Santana is unable to work outside the home. Accordingly, the Court finds that she has suffered a loss of earning potential which is directly attributable to her husband's condition. Economist Juan Villeta Trigo testified that he performed an analysis to quantify Mirta Santana's loss of earning potential. Joint Exhibit XV. Taking into account Ms. Santana's work history, salary and benefits, as well as her attempts to seek work after she lost her job in 1998, Mr. Villeta calculated back pay from the date of the incident until the present, and front pay up to and including age 65 and, alternatively, age 70. Assuming that Ms. Santana were to work up to the age 65, Mr. Villeta calculated her back pay up to the year 2005 to be $211,104, and her front pay to be $546,182, for a total loss of earnings of $757,286. If she were to work up to age 70, the front pay was calculated at $685,830, for a total loss of earnings of $969,034.

The defendant's expert, Reynaldo Quiñones, performed his own calculations as to Mirta Santana's claimed loss of earning potential (Joint Exhibit IV). His original calculation of backpay and frontpay was $261,635. At trial, he testified that he had deducted social security benefits from his original calculation, and revised his figure to $325,422, excluding the social security benefits, because the receipt of these benefits admittedly "has nothing to do with [Mirta's] own capacity to earn income." Tr. 6/29/2006, at 21, ln. 3–8; 23, ln. 23–25. Mr. Quiñones also testified that he used a 33% discount factor to account for unemployment periods due to voluntary unemployment. The 33% factor was not based on any statistical information, but rather on Mr. Quiñones "own experience and analysis of this case." *Id.*, at 21, ln. 19–23. One of the reasons for his use of this discount factor was the fact that Ms. Santana had suffered from breast cancer. *Id.*, at 22, ln. 5–7. Assuming, as per Ms. Santana's uncontroverted testimony, that she

is completely free of breast cancer, Mr. Quiñones revised the discount factor by half, to 17%, which would yield an alternate computation of lost earning potential for Mirta Vega of $452,527. *Id.*, at 23, ln. 11–25; 24, ln. 1–17. The remainder of the difference between Mr. Quiñones' calculation and that of Mr. Villeta is accounted for by Mr. Quiñones use of lesser amounts for fringe and other benefits, and his insistence in considering a discount factor to the backpay figures.

After carefully considering the testimony of both experts, the Court finds that the calculations performed by expert Juan Villeta Trigo to be more reliable although the Court chooses the lower figure taking Ms. Santana's retirement at the age of 65. Consequently, the Court awards Ms. Santana **$211,000.00** for backpay until 2005 and **$546,182.00** for front pay for a total of **$757,286.00.**

b) *Javier Vega Oliveras:*

■ The Court finds that plaintiff Javier Vega, Domingo's son, had a close and loving relationship with his father prior to the incident subject of the complaint. Docket No. 60, at 7, ln. 23. During his trial testimony, the Court was able to carefully observe Javier's demeanor, and the Court has no doubt that he has genuinely suffered mental anguish as a result of his father's condition. The Court notes that upon viewing at trial photographs of his father after the incident subject of this case, Javier genuinely lost control of his person and broke down several times during his testimony. He was married when the incident at the Veteran's Administration Hospital occurred and resided in the continental United States. He visited his father during the hospitalization and simply could not return because he could not emotionally handle to continue to see him in his current state. Prior to coming to Puerto Rico for the trial, he had not seen his father since the days following his visit

to the hospital after the incident. He testified that visiting his father is simply too painful for him, and that he therefore has remained in New Hampshire, where he is raising a young family. *Id.*, at 13, ln. 13–17. His testimony as a whole moves the Court to conclude that Javier had a very close relationship with his father, and that he has suffered great anguish at the loss of his father with whom he shared a close relationship prior to his marriage. Accordingly, the Court finds that the sum of $200,000.00 constitutes reasonable compensation for the past, present and future mental suffering of plaintiff Javier Vega.

### c) *Domingo Vega Morales:*

#### 1. *Life Care Plan:*

Plaintiffs offered testimony at trial by life-care planner Michael Morganstern [11] regarding the projected cost of Mr. Vega's future cares. Plaintiffs further submitted Mr. Morganstern's plan to a valuation performed by Mr. Juan Villeta Trigo.[12] Defendants also proffered testimony at trial by a valuation expert, Mr. Reynaldo Quinoes Marquez.

Upon careful study by both valuation experts of the life care plan proposed by Mr. Morganstern, Mr. Villeta Trigo concluded that the cost of care for Mr. Vega up to the age of 71, adjusted to those Veteran Administration benefits already being received by Mr. Vega, is that of a yearly minimum of $152,714.00 and the lifetime minimum of $2,042,246.00. Docket No. 60, at 25, ln. 1–2, 20–30; 26, ln. 13–24. Mr. Reynaldo Quinones Marquez, defendant's valuation expert, somewhat agreed with plaintiffs' valuation expert's opinion. Mr. Quinones calculated the cost of care for Mr. Vega up to the age of 71 at $2,156,-167.00—an amount even higher than the one calculated by plaintiffs' expert.

In light of these calculations, the Court finds that plaintiffs Domingo Vega is to be reasonably compensated for the costs of caring for Domingo over the course of his lifetime beyond the expenses currently being paid by the Veteran's Administration which are to continue during his lifetime pursuant to the valuation performed by plaintiffs' expert ($2,042,246.00) for total a monthly sum of **$7,091.13** to be paid on a monthly basis from the date he was permanently moved to Ms. Santana's house until the time of his death. The Court rejects the suggestion of both parties that a lump sum payment be made based on life expectancy basis.

#### 2. *Emotional Pain and Suffering:*

As has been discussed in detail above, plaintiffs' own medical expert, Dr.

---

11. The needs and care of Domingo Vega were evaluated by Michael Morgenstern, a rehabilitation specialist who was accepted by the Court as an expert, without objection. His curriculum vitae was admitted in evidence as Joint Exhibit XVI. Mr. Morgenstern reviewed Domingo's medical records, met with his doctors and visited him at home. He researched the costs and availability of various goods and services that Domingo requires for his daily care. Based on this investigation, Mr. Morgenstern prepared a "Life Care Plan" for Domingo, which was submitted in evidence as Joint Exhibit XVII. In essence, the "Life Care Plan" details the various items that are and will be necessary to ensure that Domingo receives proper care over the remainder of his life in addition to those currently being supplied by the Veteran's Administration. Mr. Morgenstern testified at trial and fully explained each item included in the "Life Care Plan".

12. Economist Juan Villeta Trigo, who testified at trial on behalf of the plaintiffs, was qualified as an expert economist by this Court on numerous occasions. Docket No. 60, at 5, ln. 12–14. His curriculum vitae was admitted as Joint Exhibit XIII, and his expert report admitted as Joint Exhibit XIV. Mr. Villeta performed a calculation of the "Inflows and Outflows of Situation of Household Family of Mr. Domingo Vega and Mrs. Mirta Santana".

Gasirowski testified to the fact the fact that Mr. Vega was unconscious upon arrival at the ER. Docket No. 57, at 10, ln. 15–19. Mr. Vega was non-responsive to any type of verbal or tactile stimuli. *Id.* This medical state was further corroborated by the hospital records of the day in question. Although the patient was initially stabilized at the Veteran's Administration Hospital, he then suffered apnea and severe brain damage. Moreover, Mr. Vega's neurologist, Dr. Theresa Castro Ponce, testified that Mr. Vega's cerebral function is merely reactive. The Court does not credit any testimony that Mr. Vega is somehow conscious of his surroundings including Ms. Santana's testimony who testified that he consciously reacts to her, follows her, and wiggles his toes in reaction to commands from Ms. Santana. The testimony of plaintiffs' own neurologist is clear and unequivocal as to cerebral function being purely "merely reactive". Furthermore, according to the neurologist, plaintiff Vega does not follow any verbal commands or verbal instructions. Tr. 6/14/2006, at 67, ln. 10–20; 68, ln. 3–5 (Docket No. 58). Accordingly, the Court deems that Mr. Vega was not, and is not, aware of his surroundings or consciously perceptive as to any pain, suffering, or discomfort. Hence, plaintiff Vega cannot receive any award for damages for pain and suffering as he was not, and is not (during hospitalization and thereafter), conscious of his medical situation at any time.

## IV. CONCLUSION

For the above reasons the Court awards:

a. Compensatory damages to Domingo Vega for his loss of his physical and mental faculties, as well as past, present, and future pain, suffering, and emotional distress are not awarded.

b. Compensatory damages to Domingo Vega, Mirta Santana and the Conjugal Partnership Constituted between them for present and future expenses associated with the care of Mr. Vega, in addition to the benefits already being received by plaintiff for medical treatment provided by the Veteran's Administration, in the amount of **$7,091.13** to be paid monthly from the date he was permanently moved to Ms. Santana's house up until the time of his death.

c. Compensatory damages to Mirta Santana for her past, present, and future pain, suffering and emotional distress, in the amount of **$3,000,000.00**.

d. Compensatory damages to Mirta Santana for her past, present, and future loss of earning capacity in the amount of **$757,286.00**.

e. Compensatory damages to Javier Vega for his past, present, and future pain, suffering, and emotional distress in the amount of **$200,000.00**.

f. Plaintiffs are further entitled to **costs** as prevailing party,[13] and interests after judgment.[14]

**IT IS SO ORDERED.**

13. The Court makes a specific finding that plaintiffs are not entitled to attorney's fees provided that no temerity can be attributed to defendant in this case. Both plaintiff and defendant presented the Court with a series of factual and legal contentions that more than merited to be hard-fought as both parties well presented in the instant case.

14. P.R. Laws Ann. tit. 32 App. III R. 44.3(a) states: "Interest, at the rate fixed by regulation by the Finance Board of the Office of the Commissioner of Financial Institutions in effect when judgment is pronounced, shall be included in every judgment ordering the payment of money, to be computed on the amount of the judgment from the date is was

52

pronounced and until paid up, including costs and attorney's fees." *See also Newell Puerto Rico, Ltd. v. Rubbermaid Inc.,* 20 F.3d 15 (1st Cir.1994) (holding that in Puerto Rico, the Rule on pre-judgment interest is a rule of decision that should be applied by the federal court sitting in diversity. The decision to award such a fee is within the discretion of the district court and will only be altered on appeal where there has been an abuse of that discretion.). Similarly, 28 U.S.C. § 1961(a) states, in relevant part, that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." Furthermore, said interests "shall be payable from the date the judgment was entered in the district court." *Cordero v. De Jesus–Mendez,* 922 F.2d 11, 16 (1st Cir.1990).